CARAWAY, J.
|/The defendant appeals his conviction and sentence for attempted second degree murder and home invasion. He argues in part that the evidence was insufficient to convict him and that his sentence is unconstitutionally excessive. Finding no error in the trial court’s rulings, we affirm.

Facts

In the early morning hours of July 23, 2011, Terry Gilpin (“Gilpin”) was at his home sitting on his bed, while his friend Mark Williamson (“Williamson”) was taking a shower in the bathroom nearby. Two men, at least one of whom was wearing a bandana as a mask, burst through the front door of the home, breaking it off the hinges in the process. Each man was armed, one with a pistol, the other with a sawed-off shotgun. One of the men came in the room threatening a frightened Gil-pin, asking multiple times, “Where is it?”
Williamson had just finished his shower and was holding the door to the small bathroom closed while the two men were harassing Gilpin. Next, one of the armed assailants began kicking the bathroom door to force it open. Williamson, who was bracing the door, was able to keep it closed. At that point, the man with the shotgun approached the door and from very close range shot the door near the middle on the same level as the doorknob. The shot from the blast blew past Williamson’s head, and the door hit him after the shot. The pellets from the shotgun blast made it to the bathtub, |2which contained several holes as a result. Once the door hit Williamson on the head, he fell down, and began playing dead.
Meanwhile, after the first shot was fired, the man with the shotgun attempted to cock the weapon, but it malfunctioned. He *722 asked the other man for the pistol, which was unloaded at that point, and stated, “Give me the gun, I’m going to kill this mother.” The other man refused to comply with the request. The two men then exited the home, only to return shortly because they had forgotten the keys to their getaway car inside the house. They attempted to knock in the front door again. This time Gilpin resisted by holding the door and throwing household items at the men. In the melee, Gilpin somehow injured his shoulder. His shirt had a hole in it, and he was bleeding. After the men successfully recovered their keys, they left.
After an investigation, police arrested Christopher Weathersby (“Weathersby”) and Wesley Austin (“Austin”) for the incident. Cellphone records placed Austin in the area of the crime at the time of the offense. Detective Roppolo conducted a recorded interview with Williamson. Williamson stated he thought he heard the voice of Saunders King (“King”) in the home the night of the crime. After the interview with Detective Roppolo, Williamson was browsing King’s Facebook page, and he saw Austin and recognized him as one of the assailants. He then notified Detective Roppolo. His report to the detective was not taped. Weathersby pled guilty to unauthorized entry of an inhabited dwelling. Austin was charged by bill of information with attempted first degree murder and home invasion.
| a After a trial, Austin was convicted of attempted second degree murder and home invasion on May 22, 2013. On August 5, 2013, he moved for new trial, which was denied at the sentencing hearing the next day. At the sentencing hearing, Austin asked for a continuance to submit a letter from Williamson asking for leniency. The trial court denied the request, stating the letter would not affect its decision. Austin was sentenced to 30 years at hard labor without benefit of parole, probation, or suspension of sentence for attempted second degree murder. He was given a 20-year sentence for home invasion, the first five years to be served without benefit of parole, probation, or suspension of sentence. The sentences were designated to run consecutively.
Austin now appeals the conviction and sentence, arguing multiple assignments of error. Finding no error, we affirm the conviction and sentence.

Discussion

Sufficiency of the Evidence

Austin contends in his counseled and pro se briefs that the evidence adduced at trial was insufficient to convict him of attempted second degree murder. Each brief focuses on whether the State proved that Austin had the specific intent to kill Williamson when he blasted a shotgun through a door that Williamson was clearly behind. Secondarily, in his pro se brief, he argues that the State did not prove that he was the offender who fired the gun. He does not challenge the sufficiency of the evidence for his conviction for home invasion.
|4The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Williams, 47,245 (La.App.2d Cir.8/22/12), 103 So.3d 558, citing Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. Williams, supra. The appellate court *723 does not assess the credibility of witnesses or reweigh the evidence. Id. A reviewing court accords great deference to a fact finder’s decision to accept or reject testimony of a witness in whole or in part, Williams, supra, and a reviewing court may impinge on that discretion only to the extent to guarantee the fundamental due process of law. State v. Freeman, 45,127 (La.App.2d Cir.4/14/10), 34 So.3d 541. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Tillman, 47,386 (La.App.2d Cir.8/08/12), 104 So.3d 480.
Second degree murder is the killing of a human being when, among other things, the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly | ¡¡toward the accomplishing of his object is guilty of an attempt to commit the offense intended; it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La. R.S. 14:27(A). To prove attempted second degree murder, the State must establish beyond a reasonable doubt that the defendant specifically intended to kill a human being and that he committed an overt act in furtherance of that goal. State v. Preston, 12-798 (La.App.5th Cir.5/16/13), 118 So.3d 1129; Freeman, supra.
If a person only intends to inflict great bodily harm, and the victim did not die, at most, the defendant only attempted some type of battery. Therefore, for attempted murder, a person must specifically intend to kill the victim, and specific intent to inflict great bodily harm in the alternative is not enough to convict an offender of attempted second degree murder. See State v. Andrews, 95-129 (La.App.5th Cir.11/15/85), 665 So.2d 454.
Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. Williams, supra. The determination of whether the requisite intent is present is a question for the trier of fact. Id. The trier of fact must determine whether the defendant acted toward the commission of a crime by the totality of the circumstances. Id. For instance, the specific intent to kill may be inferred from a defendant’s pointing a gun and firing in the direction of the victim. Preston, supra, citing State v. Robinson, 11-1017 (La.App.5th Cir.5/31/12), 98 So.3d 401, writ denied, 12-1432 (La.1/11/13), 106 So.3d 547; Freeman, supra, citing State v. Brown, 03-0897 (La.4/12/05), 907 So.2d 1.
Home invasion is the unauthorized entering of any inhabited dwelling, or other structure belonging to another and used in whole or in part as a home or place of abode by a person, where a person is present, with the intent to use force or violence upon the person of another or to vandalize, deface, or damage the property of another. La. R.S. 14:62.8.
In this case, Weathersby pleaded guilty to unauthorized entry for his involvement in the crime. He testified that he came into Shreveport to traffic methamphetamine in order to pay off a $400 debt he owed. He encountered Austin at a convenience store, and followed him to Christa Walker’s house to obtain the drugs to take back to Texas. Weathersby testified that this was his first encounter with Austin *724 and that Walker and Austin obtained eight ounces of methamphetamine from Williamson. Weathersby testified he was to bring five ounces of those eight ounces back to Texas, which he said was to have a value of $100 per ounce, four ounces of which would be used for repayment of the $400 debt.
When Weathersby and Austin arrived at Walker’s house, Weathersby testified that Austin and others were angry, and were saying that Williamson had provided them with drugs they believed were fake. He testified that Austin then pointed a gun at him and ordered him to leave with him to go get the money back or to “get the other stuff or whatever.” Weathersby testified that he and Austin were told that Williamson was at a casino. They 17went to the casino and waited to confront Williamson until after he left. Weathersby testified that he and Austin followed Williamson to the Gilpin home.
Next, Weathersby testified, Austin pointed a sawed-off shotgun at him and gave him a pistol with the inscription “1911” on it. The pistol was not loaded, and Austin placed the clip for the pistol in his pocket, which contained ammunition. Austin ordered Weathersby to kick in Gil-pin’s door, and he complied. Austin approached Gilpin who was lying on a bed and asked, “Where is it?” Weathersby testified that Austin told him to kick in the door to the bathroom in which Williamson was showering. Weathersby complied, and the door immediately closed back. Weathersby heard a voice behind it. Weathersby then testified that Austin ran up to the bathroom door and fired the shotgun.
Photographs of the crime scene show that the bathroom was small and that the hole in the door from the blast was level with the doorknob and slightly left of the door’s center toward the doorknob. The pellets from the shot reached the bathtub, and photographs show several holes in it from the shot. Weathersby testified that Austin attempted to cock the shotgun, but it jammed. Dr. Richard Lee Wigle, trauma surgeon and Associate Professor of Surgery at LSU, testified the shot used was designed to kill a large animal but could also kill a human.
After Austin shot at the bathroom door, he asked Weathersby for the pistol and said, “Give me the gun, I’m about to kill this mother.” Weathersby stated he did not give Austin the gun. At that point, | sWeathersby and Austin exited the home, but went back and kicked in the door again because Austin had left his keys inside. Weathersby testified that during the crime, Austin was wearing a green bandana on his face, and Weathersby was not wearing anything covering his.
Officer Brandon Masters testified that he found a green bandana at a travel trailer where Austin was staying at the time. This bandana was introduced into evidence. Austin’s cellphone records were identified and analyzed by Detective Chad Madden and Officer Cortez Bridges, who each testified at trial. The records indicated that in the hours leading up to the crime, Austin was moving around Shreveport and Bossier City, and the records placed him in the area of Gilpin’s home at the time of the crime.
Dustin Clotiaux, Austin’s stepbrother, testified that Austin came to him to repair a gun that would not eject shells after firing. He testified that the weapon was a shotgun with a short barrel. He also stated that Austin possessed a Colt 1911 pistol. Christa Walker testified that on the night of the crime, Austin had a sawed-off shotgun at her home and left with Weath- • ersby from her home on the night of the crime.
*725 Terry Gilpin, who had been expecting Williamson to arrive on the night of the crime to celebrate his birthday, also testified. He testified that he was sitting on his bed with his computer while Williamson was taking a shower in the bathroom nearby. He heard a really loud bang come from the living room, as well as people running through the house. Gilpin stated that Williamson came out of the bathroom asking what was going on. He said that someone then kicked in the bedroom door and that two men wearing | ¡¡bandanas entered the room. One of the men looked under the bed, and started asking him, “where is it[?]” and then asked “if [Gilpin] wanted to die tonight.” He testified he could hear Williamson in the bathroom and people trying to get into the bathroom. Gilpin testified he then saw a flash of light accompanied with the smell of smoke and a pop sound. He stated, “I remember a smaller guy,[1] he like opened the gun in half, I guess, I don’t know, to reload, to empty the shell, I’m not sure.” Terry Gilpin also testified he was familiar with Saunders King since around 2002.
Williamson testified that he had exchanged methamphetamine with Heath Leggett and Saunders King, who, according to Weathersby and Christa Walker, were at Walker’s house when Weathersby arrived on the night of the crime. Williamson testified that he was getting calls from King and Leggett about meeting up to provide them with methamphetamine on the night of the crime. King had been persistent that day about obtaining the drugs, so Williamson went straight to meet them when he came into Shreveport from Texarkana, where he was working. Williamson testified he then went to the casino. Williamson testified that after he left the casino, he drove to Gilpin’s house, where he was staying that night. He testified that when he exchanged the drugs with Leggett and King, he spoke with Gilpin telling him he would be late.
When Williamson arrived at Gilpin’s home, he took a shower. Soon after he finished, the front door came down, and the two offenders came in with guns. He admitted that he had not initially told detectives he thought it |inwas Austin, but told officers that he thought he heard King. He explained that after the interview, he was scrolling through the cohorts of King on Facebook, where he saw Austin’s picture. Williamson then reported to the detective that he believed Austin was the perpetrator.
Williamson testified that he was holding the door shut with his hands and bracing himself with his feet against the bathtub behind him because one of the intruders was attempting to kick the door open. At that point, he testified, he felt a gun blast right past his head. He stated that the door shifted forward and hit him on the head. After that, he played dead until the intruders left.
The State’s evidence concerning Austin’s specific intent to kill Williamson begins with the fact that Austin and Weathersby waited for Williamson at the casino and followed him to Gilpin’s house. Beyond a reasonable doubt, Williamson’s involvement in drug transactions caused Austin to seek him out on the night in question. Thus, when Austin entered the home and encountered only Gilpin, the person resisting the break-in behind the closed bathroom door was clearly understood to be Williamson. Next, the use of the sawed-off shotgun with heavy shot *726 demonstrates the requisite intent to kill. The level of the blast and its location near the knob indicate that any person in the small bathroom could be killed by the scattering of shot from the gun. With certain facts corroborating Weathersby’s version of events, his involvement in the crime did not prevent the jury from crediting some or all of his testimony. Weathersby reported that Austin initially attempted to eject the spent shell and re-cock |nthe shotgun. Failing in that effort, Austin sought to obtain the other gun and threatened to kill Williamson who was lying in the bathroom.
Regarding the fact of Austin’s involvement at the scene and his shooting the bathroom door, Gilpin testified that the smaller of the two intruders shot into the door. The record indicates that Weathers-by was the larger man. Austin was tied to the shotgun by the testimony of Walker and Clotiaux. All of this corroborates Weathersby’s testimony that Austin fired the shotgun into the bathroom.
Accordingly, in the light most favorable to the prosecution, this evidence sufficiently shows beyond a reasonable doubt Austin’s specific intent to kill Williamson.
This assignment of error lacks any merit.

Introduction into Evidence of the Cellphone Records

Austin argues in his counseled and pro se briefs that his cellphone records were inadmissible because they were not properly certified and authenticated. This was also a ground for his motion for new trial at the trial court, the denial of which he also appeals. Additionally, he asserts that he was denied the Sixth Amendment right to confront witnesses against him, and that the records are not admissible under the business-records exception to the hearsay rule.
In all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. U.S. Const, amend. VI. An accused is entitled to confront and cross-examine the witnesses against him. La. Const, art. I, § 16. The Tenth Circuit United States Court of Appeals in U.S. v. Yeley-Davis, 632 F.3d 673, 678-81 (10th Cir.2011) has determined that cellphone records of calls made and received, as well as affidavits certifying those records, are not testimonial and therefore not subject to the Confrontation Clause of the U.S. Constitution.
Austin also argues that the records were not properly admitted as business records under the La. C.E. art. 803(6) exception to hearsay evidence.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). “The Louisiana Supreme Court has held that telephone records do not constitute hearsay since they are ‘generated solely by the electrical and mechanical operations of the computer and telephone equipment, and [are] not dependent upon the observations and reporting of a human declarant.’ ” State v. Austin, 12-629 (La.App.5th Cir.3/13/13), 113 So.3d 306, 316, quoting State v. Armstead, 432 So.2d 837, 839-40 (La.1983); see also State v. Carter, 97-2902 (La.App.4th Cir.5/10/00), 762 So.2d 662.
Therefore, the cellphone records in this case are not hearsay, which answers the defendant’s contentions regarding his right of confrontation and the business records rule. Nevertheless, a proper foundation for authenticity and chain of custody must still be laid for the introduction of the records.
*727 The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. La. C.E. |isart. 901(A). The following are non-exclusive examples of such evidence: (1) Testimony that a matter is what it is claimed to be; (2) Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated; or (3) Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances. See La. C.E. art. 901(B).
Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to any signature, document, or other matter declared by Act of Congress or by Act of the Louisiana Legislature to be presumptively or prima facie genuine or authentic. La. C.E. art. 902(4). Pertinently, 28 U.S.C.A. § 1746, provides:
Wherever, under any law of the United States or under any rule ... any matter is ... permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same ... such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
(2) If executed within the United States, its territories, possessions, or commonwealths: “I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).
(Signature)”.
Cases in the jurisprudence often state it is a fundamental law of evidence that an article or substance which is introduced as demonstrative evidence, or to which a witness is asked to testify, must be sufficiently identified as the one involved in the occurrence in question. The foundation must be laid which connects the specimen with its source, showing that it 114was properly taken by an authorized person, properly labeled and preserved, properly transported for analysis, and properly tested. Evans v. Olinde, 609 So.2d 299 (La.App. 3d Cir.1992), citing Bufkin v. Midr-American Indem. Co., 528 So.2d 589 (La.App. 2d Cir.1988).
In this case, Officer Chad Madden testified that he made an application to AT & T for Austin’s cellphone records in July 2011 shortly after the crime was committed. He testified that AT & T complied with the request by sending the documents. The certificate of authenticity of the records was requested weeks before the trial of this matter. AT & T responded to the request by sending photo copies of the record that it had originally sent with a certification from an AT & T custodian of records. The certification states in pertinent part
Attached to this Declaration are true and correct copies of subscriber information and/or call detail issued by AT & T for the following accounts:
Cellular Number(s): (xxx) xxx-xxxx. Pursuant to 28 U.S.C. Sec. 1746, I declare, under penalty of perjury, that the foregoing is true and correct.
Executed on April 25, 2013.
// Carol Gilligan.
Officer Madden testified that the copies that were sent with the certification were *728 the same records as those that were received in 2011 and analyzed by Officer Bridges. He testified that he then sent the records to the district attorney’s office.
Officer Madden’s testimony and review of the AT & T records and the AT & T certification pursuant to 28 U.S.C.A. § 1746 sufficiently | ^authenticated that the records were what the proponent of those records purported them to be. Further, the chain of custody was established by Officer Madden’s testimony that he sent the records to the district attorney. Accordingly, the evidentiary ruling and the trial court’s denial of the defendant’s motion for new trial on those evidentiary grounds were not an abuse of discretion.

Admissibility of Williamson’s Taped Police Interview

Austin also assigns as error the trial court’s failure to allow the defendant to play Williamson’s police statement to the jury. The statement was over an hour long. Austin argues that he should have been able to play the tape because Williamson never implicated the defendant in the recorded interview. Rather, Williamson stated that he thought he heard Saunders King during the break-in. He also testified at trial that he identified Austin as the perpetrator after the interview when he went back to the interviewing detective’s office to show him Austin’s Fa-cebook profile. At trial and appeal, Austin contends that this was an identification of Kiing as the perpetrator, and thus the tape should be played to rebut Williamson’s testimony that he identified Austin as the offender. The State objected at trial on the basis that Austin did not lay a proper foundation to impeach the witness. The defendant also asserted in his motion for new trial that he was denied his right to confront the witness because the tape was not played. The defendant contests the denial of the motion for new trial.
Generally, out-of-court statements may be admitted into evidence for the purpose of impeaching a witness’s credibility to prove that a witness |1fimade a prior inconsistent statement that the witness denies having made. An oral assertion, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter is hearsay. La. C.E. art. 801(A)-(B). Hearsay is not admissible except as otherwise provided by the Code of Evidence. See La. C.E. art. 802. However, a statement is not hearsay if the declar-ant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is, “[i]n a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness’s attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement.” La. C.E. art. 801(D)(1)(a) (emphasis added). Further, except as the interests of justice require, a prior inconsistent statement is admissible after the proponent has first fairly directed the witness’s attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so. La. C.E. art. 618.
Here, Williamson testified that he identified Austin to the interviewing detective by showing him Austin’s Facebook profile after the recorded statement to the detective. Defendant’s counsel then asked him why he told the detective in the interview that he thought he heard Saunders King. He responded that he thought he did hear King and that is what he told the detective. Later in the testimony the defendant attempted to play a portion of the recorded interview in which identified only *729 King. At that [ l7point, the State repeatedly objected because a foundation was not properly laid for the tape.
Thereafter, the judge excused the jury from further hearing the evidentiary dispute. The trial judge explained:
But. Mr. Bokenfohr, he has testified. He has responded to your questions on two separate occasions that he acknowledged to the detective that he heard Sandy King’s voice.... And you brought out the point that he hasn’t said anywhere in that interview that there was a Facebook page or showing anyone a Facebook page. So playing one hour of a taped interview would be totally irrelevant to prove the point that he’s already acknowledged in your cross-examination.
The trial court later reiterated the rule for the allowance of impeachment evidence in its final ruling on the matter:
He’s already testified about hearing Sandy King’s voice twice. He’s already testified that he never told in the interview he did not tell — in the recorded interview that he did not tell Mr. Roppo-lo or Detective Roppolo that it was Wesley Austin. He testified it took place at a later time. You can certainly call Detective Roppolo and ask him that on your case-in-chief, but you have not given him an opportunity to acknowledge or deny the inconsistent statement that you’re alleging that he made. If he denies it, you play the audio. If he acknowledges it, you’ve proven your point and you move on.
The court then called the jury back into the courtroom and Williamson’s testimony resumed. Defendant’s attorney then read the following excerpt from the recorded interview: “So I hear him and it sounded like Sandy King.... It sounded like his voice and I thought why would he be here and then I thought that makes sense.” The attorney then asked if Williamson remembered making that statement, to which he said he did. Then the attorney asked, “You just testified ... you told Detective Roppolo that you recognized Wesley Austin, but that’s not what that _bstatement said; correct?” Williamson responded, “That’s not what that statement said, but I recognized him.”
The trial court aptly explained the basics of the admissibility of prior inconsistent statements. Before a prior inconsistent statement is admissible into evidence, the statement must be brought to the attention of the declarant. The attorney showed Williamson the statement he made in the interview — even read it to him so the jury could hear it. In the statement, he told Detective Roppolo that he thought he heard Saunders King in the house. Williamson admitted making the statement. Because he admitted it, and even testified that the identification of Austin occurred after the recording ceased, the trial court correctly denied the use of the tape for impeachment. The questioning and admissions alone were sufficient to cast doubt on the credibility of the witness. Therefore, the trial court did not abuse its discretion on this evidentiary ruling.

Bight to a Speedy Trial

Austin in his pro se brief argues that he was denied his Sixth Amendment right to a speedy trial. Austin was arrested on August 6, 2011. He claims he filed numerous motions for a speedy trial, particularly one on November 17, 2012, with an accompanying affidavit of his attorney certifying that he would be ready for trial in 120 days. Trial was scheduled to begin on February 4, 2013, but was continued to April 15, 2013, because Williamson was incarcerated in Texas at the time and a request to have him transported to testify was pending. The trial was continued to May 20, 2013, which was 55 days after the *730 trial was originally scheduled to begin. | , ¡Austin also argues that King became unable to testify as a result of these delays.[2]
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. U.S. Const, amend. VI; La.C.Cr.P. art. 701(A). The constitutional right provided in the U.S. and Louisiana constitutions, and the statutory right to speedy trial provided in La.C.Cr.P. art. 701, are not equivalent. State v. Logan, 45,136 (La.App.2d Cir.4/14/10), 34 So.3d 528.
The constitutional right to a speedy trial is fundamental and guaranteed to the accused. U.S. Const, amend. VI, XIV; La. Const, art. I, § 16; Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); Logan, supra. The right attaches when an individual becomes an accused, either by formal indictment or bill of information or by arrest and actual restraint. Logan, supra. Louisiana has adopted the balancing test set forth in Barker v. Wingo, supra, in which the conduct of the prosecution and the defendant are weighed. Logan, supra. The four factors to be considered under the test are (1) the length of the delay; (2) the reason for the delay; (3) the defendant’s assertion of his right; and (4) prejudice to the defendant, such as the possible impairment of the presentation of the accused’s defense. Barker v. Wingo, supra.
The Code of Criminal Procedure article 701 provides that the sole remedy for failure to commence trial within the mandated time period is |2npretrial release without bail.[3] Logan, supra. Once a defendant has been tried and convicted, his claims under Article 701 become moot. Id.
*731 Motions pending at the commencement of trial are waived once the defendant proceeds to trial without raising the objection that the court has failed to rule on the outstanding motions. Logan, supra. All claims made by defendant pursuant to La.C.Cr.P. art. 701 are moot when the defendant has been convicted and sentenced. Id.
In this case, the issue of Austin’s right to a speedy trial under Article 701 is moot because he proceeded to trial without objecting that his request for speedy trial was denied. Further, he has also been convicted and sentenced. Therefore, his claim lies only in an asserted constitutional violation, and we conclude there has been none.
121 Austin asserted his right to a speedy trial for the first time in July 2012, less than a year after his arrest and less than a year before the trial actually commenced in May 2013. His first counseled motion for speedy trial was filed in November 2012, and the trial began 175 days after the motion was filed, and only 55 days past the maximum time allowed in Article 701 without just cause. However, the State had just cause in this case, because the victim and witness was incarcerated in Texas, and the delay in transporting him to Louisiana for the trial was beyond the control of the prosecution.
Finally, Austin has failed to show how the delay prejudiced his defense beyond the assertion that King was not available to testify when he was called as a witness. Moreover, King was not even listed as a defense witness. Austin’s assertion that King was the actual offender was brought out in Williamson’s testimony concerning his statement that he thought he heard King in the home. Thus, no prejudice resulted.
This assignment of error lacks merit.

Failure to Allow 2U-Hour Delay After Motion for New Trial

Austin argues that his sentence should be vacated because the trial court did not grant his sentencing continuance after the trial court denied a motion for new trial and sentenced him on the same day. Austin sought to continue the trial to submit a letter that Williamson wrote asking for leniency. He argues that because the trial court failed to observe the 24-hour delay period after a denial of a motion for new trial and sentencing ^required by La. C.Cr.P. art. 873, the trial court erred. We find any error here to be harmless.
If a defendant is convicted of a felony and if a motion for new trial is filed, sentence shall not be imposed until at least 24 hours after the motion is overruled, unless the defendant expressly waives the delay. La.C.Cr.P. art. 873. A defendant may also implicitly waive the 24-hour delay. See State v. Wilson, 12-1765 (La.App.4th Cir.2/12/14), 138 So.3d 661, citing State v. Santos-Castro, 12-0568 (La.App.4th Cir.07/31/13), 120 So.3d 933, 943-44, and State v. Robichaux, 00-1234 (La.App.4th Cir.3/14/01), 788 So.2d 458, 464.
Vacation of a sentence for failure to observe the 24-hour delay is not required if the error is harmless and no prejudice is shown. State v. Wallace, 46,-422 (La.App.2d Cir.8/10/11), 71 So.3d 1142, citing State v. White, 404 So.2d 1202 (La.1981); State v. Bobo, 46,225 (La.App.2d Cir.6/8/11), 77 So.3d 1. Failure to observe the 24-hour period has been considered harmless where there is a sufficient delay between the date of conviction and the date of sentencing; there is no indication that the sentence is hurriedly imposed; and there is no argument or showing of actual prejudice by the failure to observe the 24-hour delay. State v. Foster, 02-0910 (La.App.4th Cir.12/11/02), 834 So.2d *732 1188, citing State v. Sam, 99-0300 (La. App.4th Cir.4/19/00), 761 So.2d 72, 78, writ denied, 00-1890 (La.9/14/01), 796 So.2d 672 (delay between conviction and sentencing just under one month); State v. Dickerson, 579 So.2d 472, 484 (La.App. 3d Cir.1991),« writ granted in part, 584 So.2d 1140 (La.1991) (delay between conviction and sentencing over one month).
In this case, Austin was convicted on May 22, 2013. He filed a motion for new trial on August 5, 2013, nearly 2½ months after the conviction and also the day before his sentencing was set. On August 6, 2013, at the sentencing hearing the trial court denied the defendant’s request for a continuance for consideration of a letter Williamson had written to the trial judge seeking leniency. The trial court stated:
Under Article 894.1 of the Louisiana Code of Criminal Procedure it gives us some guidelines to determine or to follow for the purposes of sentencing and I don’t—the Court would not be influenced by a letter from Mr. Williams [sic ]. I have received letters on behalf of Mr. Austin from Mr. Austin himself and from family members and I’ve taken all of that into consideration for purposes of this sentencing, So, I’m going to deny the request for a continuance.
The trial court then sentenced Austin.
Here, Austin did not implicitly or explicitly waive the delay period required by Article 873. In fact the request for a continuance could be construed as a direct assertion of the delay. However, the failure to observe the delay was harmless. Over two months passed between the conviction and the sentence. The trial court had ample time to fully consider the sentence to be imposed on Austin, and Austin waited until the last possible moment to file his motion for new trial, the day before sentencing. Finally, the trial court noted that it had factored in letters written on Austin’s behalf, and fully considered statutory sentencing guidelines. The trial court stated that Williamson’s letter would not have affected the sentence. Thus, the same sentence would have been imposed either way and the failure to Inobserve the 24-hour delay did not prejudice Austin. Accordingly, this assignment of error lacks merit.

Sentencing

Austin argues on appeal that his consecutive sentences are excessive. He was sentenced to consecutive sentences of 30 years without benefits for the attempted murder conviction and to 20 years for the home invasion conviction, the first five years without benefits. Finding no constitutional excessiveness of the sentence, we affirm.
The trial judge is given a wide discretion in imposition of sentences within the statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his discretion. State v. Thompson, 02-0333 (La.4/9/03), 842 So.2d 330; State v. Washington, 414 So.2d 313 (La.1982); State v. Abercrumbia, 412 So.2d 1027 (La.1982).
If an attempted offense is punishable by death or life imprisonment, the offender shall be imprisoned at hard labor for not less than 10 nor more than 50 years without benefit of parole, probation, or suspension of sentence. La. R.S. 14:27(D)(l)(a). Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B). Therefore, the sentence for attempted second degree murder is imprisonment at hard labor for *733 not less than 10 nor more than 50 years ■without benefits.
125At the time of the offense in 2011, La. R.S. 14:62.8 required that whoever commits the crime of home invasion shall be fined not more than $5,000 and shall be imprisoned at hard labor for not less than 5 nor more than 20 years; at least 5 years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence. La. R.S. 14:62.8 (2010).
Concurrent sentences arising out of a single course of conduct are not mandatory. Tillman, supra, citing State v. Derry, 516 So.2d 1284 (La.App. 2d Cir.1987), writ denied, 521 So.2d 1168 (La.1988). When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C.Cr.P. art. 883. It is within a trial court’s discretion to order sentences to run consecutively rather than concurrently. Tillman, supra, citing State v. Johnson, 42,323 (La.App.2d Cir.8/15/07), 962 So.2d 1126.
A judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence or record. Tillman, supra. When consecutive sentences are imposed, the court shall state the factors considered and its reasons for the consecutive terms. Id. Among the factors to be considered are (1) the defendant’s criminal history; (2) the gravity or dangerousness of the offense; (3) the viciousness of the crimes; (4) the harm done to the victims; |⅞(5) unusual risk of danger to the public; and (6) the potential for defendant’s rehabilitation. Id.
In selecting a proper sentence, a trial judge is not limited to considering only a defendant’s prior convictions but may properly review all prior criminal activity. Tillman, supra. The sources of information relied upon by the sentencing court may include evidence usually excluded from the courtroom at the trial of guilt or innocence, e.g., hearsay and arrests, as well as conviction records. Id. These matters may be considered even in the absence of proof the defendant committed the other offenses. Id.
Austin never filed a motion to reconsider sentence in this case. Thus, his claim to excessive sentence is limited to constitutional excessiveness such that it is grossly disproportionate to the seriousness of the offense or nothing more than a needless infliction of pain and suffering. See La.C.Cr.P. art. 881.1; see also State v. Mims, 619 So.2d 1059 (La.1993).
Regarding a claim for constitutional excessiveness, Louisiana Constitution Article 1, § 20 states, “No law shall subject any person to ... cruel, excessive, or unusual punishment.” A sentence violates La. Const. Art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Bobo, 46,225 (La.App.2d Cir.6/08/11), 77 So.3d 1; State v. Hodge, 41,097 (La.App.2d Cir.8/23/06), 938 So.2d 1066. A sentence is considered grossly disproportionate if, when the crime and punishment arej^viewed in light of the harm done to society, it shocks the sense of justice or makes no reasonable contribution to acceptable penal goals. Hodge, supra.
The trial court in this case was not required to impose concurrent sentences even though the attempted murder and the home invasion occurred in the *734 same “transaction.” The court expressly stated in Austin’s sentencing that he was being sentenced to consecutive sentences. The trial court observed that Austin is a multiple felony offender, and that the state chose not to pursue a habitual offender adjudication. The trial court determined that the likelihood of Austin committing more offenses was “extremely high” if he were not in jail. The trial court was concerned that Austin’s act of attempted murder came within inches of resulting in the death of a person.
Given these considerations, we cannot say that the trial court erred in imposing consecutive sentences. Although Austin faces 35 years in prison without benefits, his felony record weighed heavily into the trial court’s ruling. Given the gravity of the offense of breaking into a home and attempting to kill a human being, we cannot say that the combined consecutive sentences are a needless infliction of pain and suffering. Therefore, the consecutive sentences are not constitutionally excessive.
This assignment of error lacks merit.

Ineffective Assistance of Counsel

Austin also asserts in his pro se brief that his trial counsel was constitutionally ineffective because he failed to notify Austin of a 20-year plea deal, which he argues he would have accepted. As a general rule, a 12Sclaim of ineffective assistance of counsel is properly raised in an application for post-conviction relief (“PCR”) in the trial court rather than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C.Cr.P. art. 930. State v. Robinson, 45,820 (La.App.2d Cir.1/26/11), 57 So.3d 1107, citing State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Ellis, 42,520 (La.App.2d Cir.9/26/07), 966 So.2d 139. When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. Robinson, supra, citing State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Willars, 27,-394 (La.App.2d Cir.9/27/95), 661 So.2d 673.
We find that the record does not contain sufficient evidence for this court to make a determination about any plea bargain offer that Austin attempts to assert. The facts of whether Austin was told about any deal would be best revealed in an evidentiary hearing. Further, a hearing would provide better evidence of what prejudice, if any, Austin suffered from the deficient counsel, especially in light of Austin’s previous refusal of much more lenient plea arrangements.

Conclusion

For the foregoing reasons, we affirm Austin’s conviction and sentence.
AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, CARAWAY and DREW, JJ.
Rehearing denied.

. Williamson agreed on cross examination that Weathersby was "a very tall man ... huge actually.”

. Saunders King was subpoenaed by the State to testify for the State. He did not appear, and the State elected to close its case.

. La.C.Cr.P. art. 701 provides in pertinent part:
B. The time period for filing a bill of information or indictment after arrest shall be as follows:
(0(a) When the defendant is continued in custody subsequent to an arrest, an indictment or information shall be filed ... within sixty days of the arrest if the defendant is being held for a felony.
[[Image here]]
Failure to institute prosecution as provided in Subparagraph (1) shall result in release of the defendant if, after contradictory hearing with the district attorney, just cause for the failure is not shown. If just cause is shown, the court shall reconsider bail for the defendant. Failure to institute prosecution as provided in Subparagraph (2) shall result in the release of the bail obligation if, after contradictory hearing with the district attorney, just cause for the delay is not shown.
[[Image here]]
D. (1) A motion by the defendant for a speedy trial, in order to be valid, must be accompanied by an affidavit by defendant’s counsel certifying that the defendant and his counsel are prepared to proceed to trial within the delays set forth in this Article. After the filing of a motion for a speedy trial by the defendant and his counsel the time period for commencement of trial shall be as follows: (a) The trial of a defendant charged with a felony shall commence within one hundred twenty days if he is continued in custody and within one hundred eighty days if he is not continued in custody.
[[Image here]]
(2) Failure to commence trial within the time periods provided above shall result in the release of the defendant without bail or in the discharge of the bail obligation, if after contradictory hearing with the district attorney, just cause for the delay is not shown.
E. "Just cause" as used in this Article shall include any grounds beyond the control of the State or the Court.