STONE, J.
The defendant, Quindarius Allen, was charged with second degree murder and attempted second degree murder. Following a jury trial, Allen was found guilty as charged of second degree murder and sentenced to life imprisonment at hard labor, without benefit of probation, parole, or *706 suspension of sentence. On the second count, Allen was found guilty of the responsive verdict of attempted manslaughter and sentenced to serve 20 years at hard labor. Allen now challenges the constitutionality of his sentences. For the following reasons, Allen's convictions and sentences are affirmed.
FACTS AND PROCEDURAL HISTORY
On October 13, 2014, at 10:02 p.m., the Shreveport Police Department received a 911 call of shots fired at the Cajun Inn motel in Shreveport. Shreveport Police Officers Larry McCloskey ("Officer McCloskey") and Jason Allgrun ("Officer Allgrun") responded and found the door to room 205 ajar but observed no damage to the door or door frame. Upon entry into the room, the officers discovered the body of a black male on the floor in a pool of blood just behind the door. The male victim was deceased from what appeared to be a large gunshot wound to the face and neck. Officers McCloskey and Allgrun also observed blood, flesh, and pieces of the victim's beard all over the door, ceiling, and floor. The deceased man was later identified as Gregory Morris ("Morris"), the occupant of the room. A black female, identified as Shreetha Haskins ("Haskins"), was sliding along the floor on her stomach toward the officers, screaming for help. The officers could see that both of Haskins' legs had large wounds that appeared to be made by a shotgun, and half of one leg appeared to be missing. The absence of damage to Morris' motel room door and frame indicated there was no forced entry into the room, and Morris likely knew the shooter.
During the course of investigation, Quindarius Allen ("Allen") was arrested and indicted by a grand jury on charges of second degree murder, in violation of La. R.S. 14:30.1, and attempted second degree murder, in violation of La. R.S. 14:30.1 and La. R.S. 14:27. The jury trial began November 16, 2017.
During trial, Lead Detective David Bonillas ("Detective Bonillas") testified that surveillance video from the motel showed that several hours before the shootings, a burgundy Grand Marquis entered the motel parking lot and a black male wearing dark pants, a jacket with a football emblem, a hoodie, and white shoes, exited the vehicle and walked upstairs to Morris' room, before returning to the Grand Marquis.
At the time of the shootings, the surveillance video from a nearby business and the motel showed the same driver, again, get out of a burgundy Grand Marquis down the street from the motel and walk into the motel from the west. The person walked with a limp this time and gestured to one side. The suspect again went upstairs to Morris' room, and was later seen running through and away from the motel with something in his hands. The officers released a clip of the motel video of the suspect to the media.
Timar Clark ("Clark") testified Allen was a friend and former roommate, and on multiple occasions, he and Allen went together to Morris' room at the Cajun Inn to buy marijuana from Morris. Clark testified that on the night of the shootings, sometime between 7:00 and 7:30 p.m., he and Allen went to Morris' room to buy marijuana, before Allen returned Clark to Clark's mother's house. Clark testified Allen told him he was going to rob Morris one day and take all the marijuana Morris had. Clark testified he had seen Allen with two handguns and a shotgun, but did not know if he owned them. Clark testified that later that same night, between 11:00 p.m. and midnight, Allen came by Clark's mother's house and told Clark that Morris *707 had been shot and killed. Clark later saw the video the police posted online, recognized Allen as the suspect in the video, and called Allen's mother.
Allen's mother, Consuela Smith ("Smith"), confirmed Clark called her about the shooting and the online video. Smith testified she recognized her son in the video, and saw he was wearing a jacket she purchased for him. Smith gave police a Facebook picture of Allen, taken several years earlier when he was a student at Huntington High School, and in which he was wearing the same jacket with the distinguishable football emblem. Smith testified she gave the officers the address where Allen was staying and told them he drove a burgundy Grand Marquis.
Detective Bonillas testified Allen was found at the location Smith provided along with the burgundy Grand Marquis. Detective Bonillas stated Allen refused to come out of the house, so the officers were forced to send in a K-9 unit to apprehend him. Detective Bonillas testified the officers arrested Allen, seized his phone and the car, and subsequently obtained search warrants for the car, the phone, and Allen's DNA. Allen admitted he was at the motel that night and that he was the person seen in the motel surveillance video, but insisted he was merely walking around looking for his cell phone. He denied shooting Morris and Haskins.
Travis Thomas ("Thomas") testified that on the night of the shootings, he and his brother Richard went with Allen to the Cajun Inn sometime between 7:00 p.m. and 8:00 p.m. to buy drugs. Thomas testified he and his brother remained in the car while Allen went upstairs and later returned with marijuana and cocaine. Afterwards, they all went to Thomas' house for Richard's birthday party. Thomas testified that sometime around 10:00 p.m. Allen and his friend "B.J." left the party in Allen's car.
Haskins attested that her boyfriend, Morris, sold drugs from the motel room at the Cajun Inn, and she was staying with him on October 13, 2014. Haskins stated she was in bed asleep when she was awakened by the sound of a gun blast. As she sat up, she saw Morris on the floor behind the door and a black male in a jacket and hoodie standing there with a gun. Haskins indicated she yelled out, and the gunman turned and raised the gun toward her. Haskins said she raised her legs up to protect herself as the gunman fired. Haskins was struck in both legs with the shotgun, which broke both of her legs, tearing the flesh from them, and leaving gaping wounds that exposed her leg bone. Photographs of the motel room taken that night show her blood and pieces of her flesh covering the bed and floor. Photographs taken of Haskins in the hospital that night confirm the extensive nature of these severe injuries.
Haskins testified that she was in the hospital for two weeks. Her right leg was broken in three places. She had rods inserted into both legs, had a leg skin graft, and had to learn to walk again. At the time of trial, Haskins had already undergone 21 surgeries, and the 22nd surgery was scheduled.
Haskins testified she believed the shooter had been in the motel room that night, not long before the shooting, to buy drugs. Haskins stated she recognized Allen because he had been to the motel room on several prior occasions to buy drugs from Morris. Haskins identified Allen as one of several people who came up to Morris' room that night to purchase drugs from Morris.
Sgt. Eric Farquhar ("Sgt. Farquhar") testified he collected evidence from the motel that night and recovered a live 12-gauge *708 Winchester shotgun shell from the landing of the stairwell leading to Morris' room and a fired 12-gauge shotgun shell from inside Morris' room. He recalled taking pictures of the crime scene that showed blood and pieces of the victims' flesh all over the carpet, wall, door, and ceiling where Morris was shot, and on the carpet and bed where Haskins was shot.
Sgt. Farquhar testified that a live 12-gauge Winchester shotgun shell was recovered from the backseat of Allen's vehicle during inspection. The live shotgun shells recovered from the stairwell and Allen's vehicle, along with the fired shotgun shell recovered from Morris' motel room, were all sent for testing at the North Louisiana Crime Lab. Carla White ("White"), with the North Louisiana Crime Lab, was accepted as an expert in firearms identification. White stated she examined all three shotgun shells and determined that, based on the markings made on the shells as they were ejected from the shotgun, both the live shotgun shells and the fired shotgun shells were all cycled and ejected from the same shotgun.
Audra Williams ("Williams"), also with the North Louisiana Crime Lab, was accepted as an expert in DNA analysis. Williams testified that DNA testing of swabs from the shotgun shells did not produce results sufficient to provide a valid DNA profile. Williams testified that DNA testing of a blood-stained section of the seatbelt from Allen's vehicle excluded Morris and Haskins as a major contributor but could not exclude Allen. Williams testified that there was too low a concentration to obtain a valid DNA profile of the minor contributor.
James Traylor, M.D. ("Dr. Traylor"), an expert in forensic pathology, performed an autopsy on Morris. Dr. Traylor determined Morris' cause of death was a shotgun blast to the left side of the face and neck, resulting in soft tissue, vascular, and bony injury. Dr. Traylor stated the appearance of the wound indicated the shotgun blast was made at close range to the victim, probably only three or four feet away, and left a wound several inches wide.
The jury found Allen guilty as charged of second degree murder and of the responsive verdict of attempted manslaughter. Allen filed a motion for new trial and a motion for post-verdict judgment of acquittal, and both motions were denied on December 18, 2017, and the trial court sentenced Allen.[1]
The trial court noted that a conviction for second degree murder under La. R.S. 14:30.1 carries an automatic life sentence. As to count one, the conviction for second degree murder, the trial court sentenced Allen to life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence. As to count two, the conviction for the responsive verdict of attempted manslaughter, trial court stated, "based upon the facts established at trial, injuries to the victim, the court will sentence you to 20 years hard labor consecutive to the life sentence, credit for time served." No presentence investigation report was ordered.
The trial court advised Allen of the time delays to seek an appeal and post-conviction relief. The defense objected to the sentence, specifically to the 20-year sentence imposed for attempted manslaughter *709 and the consecutive nature of the sentences
On January 19, 2018, Allen filed a motion to reconsider sentence, arguing that the sentences were constitutionally excessive and that the sentences should be imposed to run concurrently. The motion was denied on January 22, 2018. This appeal followed.
DISCUSSION
On appeal, Allen argues that his sentences of life and 20 years, imposed to run consecutively, are constitutionally excessive because "a sentence more than life is merely punitive." Allen asserts that his sentences should have been imposed to run concurrently to one another.
Allen was found guilty as charged of second degree murder, which La. R.S. 14:30.1 defines, in pertinent part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm; or, when the offender is engaged in the perpetration or attempted perpetration of one of the enumerated felonies in La. R.S. 14:30.1(A)(2). Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B).
Allen was also charged with attempted second degree murder. La. R.S. 14:27 provides that any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended. Had Allen been convicted as charged of attempted second degree murder, he would have faced a potential sentence of 10-50 years at hard labor, without benefit of parole, probation, or suspension of sentence. La. R.S. 14:27(D)(1) ; La. R.S. 14:30.1.
Instead, Allen was convicted of the responsive verdict of attempted manslaughter. Manslaughter is a homicide which would be first degree murder or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection; or a homicide committed, without any intent to cause death or great bodily harm, when the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or when the offender is resisting lawful arrest in a manner not inherently dangerous and the circumstances do not constitute first or second degree murder. La. R.S. 14:31.
For his conviction for attempted manslaughter, Allen faced a potential sentence of no more than one-half the longest term of imprisonment as prescribed for the offense so attempted, manslaughter. The range for a conviction of manslaughter was 0-40 years at hard labor; therefore Allen's potential sentencing range for attempted manslaughter was 0-20.
An excessive sentence is reviewed by examining whether the trial court adequately considered the guidelines established in La. C. Cr. P. art. 894.1, and whether the sentence is constitutionally excessive. State v. Wing , 51,857 (La. App. 2 Cir. 2/28/18), 246 So.3d 711 ; State v. Gardner , 46,688 (La. App. 2 Cir. 11/2/11), 77 So.3d 1052.
A review of the sentencing guidelines does not require a listing of every aggravating or mitigating circumstance. State v. Boehm , 51,229 (La. App. 2 Cir. 4/5/17), 217 So.3d 596 ; State v. Cunningham , 46,664 (La. App. 2 Cir. 11/2/11), 77 So.3d 477. However, the court must *710 state for the record the consideration taken into account and the factual basis for the sentence imposed. La. C. Cr. P. art. 894.1(C). The court must consider the defendant's personal history, the defendant's criminal record, the seriousness of the offense, and the likelihood of rehabilitation. State v. Boehm , supra . There is no requirement that specific matters be given any particular weight at sentencing. Id. All convictions and all prior criminal activity may be considered as well as other evidence normally excluded from the trial. State v. Platt , 43,708 (La. App. 2 Cir. 12/3/08), 998 So.2d 864, writ denied , 09-0265 (La. 11/6/09), 21 So.3d 305.
Maximum sentences are generally reserved for the worst offenses and offenders. State v. Taylor , 41,898 (La. App. 2 Cir. 4/4/07), 954 So.2d 804. However, where a defendant convicted of a crime of violence has obtained a significant reduction in the potential sentence exposure, the trial court has great discretion in imposing the maximum sentence. State v. Black, 28,100 (La. App. 2 Cir. 2/28/96), 669 So.2d 667, writ denied , 96-0836 (La. 9/20/96), 679 So.2d 430.
A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey , 623 So.2d 1276 (La. 1993) ; State v. Boehm , supra. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver , 01-0467 (La. 1/15/02), 805 So.2d 166 ; State v. Wing, supra .
In cases involving multiple offenses and sentences, the trial court has limited discretion to order that the multiple sentences are to be served concurrently or consecutively. State v. Nixon , 51,319 (La. App. 2 Cir. 5/19/17), 222 So.3d 123, writ denied , 17-0966 (La. 4/27/18), 239 So.3d 836. Regarding concurrent and consecutive sentences, La. C. Cr. P. art. 883 provides that:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.
Concurrent sentences arising out of a single course of conduct are not mandatory, and consecutive sentences under those circumstances are not necessarily excessive. State v. Wing, supra ; State v. Lynn , 50,575 (La. App. 2 Cir. 5/18/16), 196 So.3d 607. It is within the court's discretion to make sentences consecutive rather than concurrent. State v. Nixon, supra ; State v. Robinson , 49,677 (La. App. 2 Cir. 4/15/15), 163 So.3d 829, writ denied , 15-0924 (La. 4/15/16), 191 So.3d 1034. For example, the sentencing court may impose consecutive sentences in cases where the offender's past criminality or other circumstances justify treating him as a grave risk to the safety of the community. State v. Walker , 00-3200 (La. 10/12/01), 799 So.2d 461. However, a judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence of record. State v. Wing, supra .
When imposing consecutive sentences, the trial court must acknowledge *711 the sentencing guidelines established in La. C. Cr. P. art. 894.1, recite factors for the sentences which were supported by the record, and show that consecutive sentences were warranted. State v. Wing, supra ; State v. Mitchell, 37,916 (La. App. 2 Cir. 3/3/04), 869 So.2d 276, writ denied , 04-0797 (La. 9/24/04), 882 So.2d 1168 ; State v. Burns , 44,937 (La. App. 2 Cir. 2/2/10), 32 So.3d 261. The imposition of consecutive sentences for multiple offenses arising from a single act or scheme must be justified by the evidence of record and the trial court must state what factors were considered in reaching the determination to impose consecutive terms. State v. Butler , 51,922 (La. App. 2 Cir. 4/11/18), 247 So.3d 1006, 1011 ; State v. Wing, supra.
Among the factors to be considered are the defendant's criminal history, the gravity or dangerousness of the offense, the viciousness of the crimes, the harm done to the victims, whether the defendant constitutes an unusual risk of danger to the public, the potential for the defendant's rehabilitation, and whether the defendant has received a benefit from a plea bargain. State v. Austin , 49,061 (La. App. 2 Cir. 7/16/14), 146 So.3d 716, writ denied , 14-2323 (La. 9/18/15), 178 So.3d 140 ; State v. Nelson , 44,762 (La. App. 2 Cir. 10/28/09), 25 So.3d 905. The failure to articulate specific reasons for consecutive sentences does not require remand if the record provides an adequate factual basis to support consecutive sentences. State v. Nelson, supra.
In State v. Wing, supra at 717, this Court vacated the sentences imposed and remanded the matter, holding that "the sparse record made at sentencing does not supply a sufficient factual basis to support the sentences. Due to the paucity of reasons for the sentences imposed, we are constrained to vacate the sentences and remand for resentencing."
The trial court has wide discretion in imposing sentence within minimum and maximum limits allowed by the statute; therefore, a sentence will not be set aside as excessive unless the defendant shows the trial court abused its discretion. State v. Hardy , 39,233 (La. App. 2 Cir. 1/26/05), 892 So.2d 710 ; State v. Young , 46,575 (La. App. 2 Cir. 9/21/11), 73 So.3d 473, writ denied , 2011-2304 (La. 3/9/12), 84 So.3d 550. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. State v. Zeigler , 42,661 (La. App. 2 Cir. 10/24/07), 968 So.2d 875. The reviewing court does not determine whether another sentence would have been more appropriate, but whether the trial court abused its discretion. State v. Esque , 46,515 (La. App. 2 Cir. 9/21/11), 73 So.3d 1021, writ denied , 11-2347 (La. 3/9/12), 84 So.3d 551.
A review of the record reveals the trial court did not order a presentence investigation report, did not reference or address the sentencing guidelines under La. C. Cr. P. art. 894.1 or any aggravating and mitigating factors, did not discuss the defendant's personal and criminal history, and did not articulate specific reasons to justify the order that the sentences were imposed to run consecutively. Accordingly, it is necessary to consider whether the record supports the imposition of consecutive sentences by the trial court.
As noted by the trial court, the sentence for second degree murder was mandatory. As for Allen's conviction for attempted manslaughter, the 20-year hard labor term, with no restriction of benefits, was within the statutory range of 0-20 years for attempted manslaughter. Accordingly, the sentences imposed were not statutorily excessive.
*712 Moreover, the maximum 20-year sentence is not constitutionally excessive. Allen's actions demonstrate more than an intent to simply rob Morris and Haskins at gunpoint, or to disable Morris and Haskins in order to rob them. Allen's intent to brutally murder these two people was evident in his choice of weapon, which made death or severe bodily injury a certainty. The facts of this case show Allen's actions were heinous and cold-blooded. Allen was not acting in self-defense. He took advantage of the fact that Morris would voluntarily open the door to a known customer with whom he frequently transacted business. This was a brutal surprise assault on Morris. Allen shot and killed Morris at the door and then turned and shot Haskins, who was sleeping in the bed farthest from the door.
Allen refused to cooperate with officers attempting to arrest him, causing further danger to the public. He refused to take responsibility for his actions and persisted in denying his involvement, even after the physical and testimonial evidence firmly established his participation in these offenses. Allen showed no remorse for the severe pain and trauma he caused these victims and their families. Morris was brutally shot and killed with no chance to defend himself. Haskins was lying in bed, also defenseless, and the horrific injuries to her legs have caused her to endure severe pain, multiple operations, and extensive physical therapy.
The record discloses the following aggravating factors found in La. C. Cr. P. art. 894.1. Allen's actions manifested deliberate cruelty to the victim and he used a dangerous weapon, a firearm, in the commission of the offense. Allen created risk of danger, death, or great bodily harm to more than one person, and his offense resulted in a significant permanent injury or significant economic loss to the victim and the victim's family.
Furthermore, the facts of this case fully support attempted second degree murder. Allen pointed a shotgun at Haskins, who was lying in bed, and shot her. Allen obtained a significant reduction in his potential sentencing exposure when the jury returned the responsive verdict of attempted manslaughter. Instead of facing a potential sentence of 10-50 years, all without benefits, Allen faced a potential sentence of 0-20 years, all of them with benefit of probation, parole, or suspension of sentence.
Given the facts of this case, and the physical, mental, emotional, and economic impact on Haskins, the imposition of the maximum sentence is not disproportionate to the severity of Allen's actions. These same facts found in this record further support the trial court's order imposing these sentences to run consecutively. As the record amply demonstrates, Allen's behavior here created an unusual risk of danger to the public and the safety of the community. The imposition of consecutive sentences here reflects the extreme danger and gravity of Allen's offenses.
Allen's complaint that any sentence beyond life is excessive and without merit. Allen committed two crimes of violence against two people and has lawfully been sentenced for each crime. The fact that he received a life sentence for the brutal murder of Morris does not negate the necessity of sentencing him for the brutal attack that he made on Haskins.
Although the trial court failed to sufficiently articulate his reasons for imposing the 20-year maximum sentence and to justify the imposition of consecutive sentences, the record here sufficiently supports both the 20-year for attempted manslaughter and running the sentence *713 consecutively to Allen's life sentence for second degree murder.
CONCLUSION
For the above reasons, Quindarius Allen's convictions and sentences are affirmed.
AFFIRMED.

There is no express waiver of sentencing delay on record. The defendant makes no complaint regarding the absence of an express waiver on appeal. In State v. White , 404 So.2d 1202 (La. 1981), the court held that failure to expressly waive the sentencing delay in La. C. Cr. P. art. 873 is harmless if there was no prejudice to the defendant and the defendant does not raise any complaint about it.