PEATROSS, J.
 

 | j Defendant, Artis D. Logan, was charged with and subsequently convicted of attempted second degree murder. After being adjudicated a habitual offender, Defendant was sentenced to 60 years at hard labor to be served without parole, probation, suspension of sentence or diminution for good behavior. Defendant now appeals. For the reasons stated herein, Defendant’s conviction and sentence are affirmed.
 

 FACTS AND PROCEDURAL HISTORY
 

 On the night of September 21, 2007, Defendant drove a woman named Tressa Soles to the home of William Garrett so that Soles could borrow money from Garrett who went by the nickname of “Plug.” Garrett’s house is located at 922 Camp Street in Monroe, Louisiana. At some point after Defendant’s arrival with Soles,an altercation took place between Defendant and Garrett. The details of how the fight began are unclear; however, Garrett appears to have been the initial aggressor.
 

 A few minutes after the altercation began, Garrett tried to retreat, but Defendant pursued him until Garrett fell to the ground. Defendant continued to attack him, ultimately slitting Garrett’s throat. Defendant then jumped in his car and left the scene. The Monroe Police Department was dispatched to the scene; and, on their arrival, the officers found Garrett lying in the street bleeding.
 

 Defendant was arrested and charged by bill of information on November 15, 2007, with the attempted second degree murder of William Garrett. The matter was set for trial on April 15, 2009. Soles, who has an extensive criminal history and was incarcerated at the time of trial, testified 12as to the events which took place on September 21, 2007. Soles testified that Garrett had arranged a ride for her from a woman named Shanta Van Burén who arrived at Soles’ house on September 21, 2007, at about 7:00 p.m. in a vehicle driven by Defendant. A female identified as “Su-chie” was riding in the back seat of the vehicle. According to Soles, the four drove to West Monroe where they dropped off Suchie and then drove back to Monroe. Soles testified that, when she tried to go home, Van Burén told her she could not leave until Soles paid her and Defendant for the ride. Soles argued at first, but ultimately asked Defendant and Van Bu-rén to take her to Garrett’s house to get the money.
 

 Soles testified that she and Defendant began arguing again after they arrived at Garrett’s house. Garrett then came outside and Soles explained the situation to him; but, when she told Garrett she did not have any money, things began to escalate. Soles testified that Defendant bent down into his car to pick up something and Garrett reacted by picking up a metal rod. Soles stated numerous times that she never saw the actual fight between Defendant and Garrett because she and Van Burén were fighting. Soles did testify, however, that she saw Garrett backing away from
 
 *532
 
 Defendant and heard the metal rod that Garrett had been holding fall to ground. In her statement to the police, Soles stated, “I didn’t see anything. All I saw is after it all happened, I saw the cut. I saw Plug laying there with his neck wide open. He got a cut on his stomach, here and a big chunk gone out of his right arm.”
 

 laThe State then called witness Robert Mitchell who was at Garrett’s house the night of the altercation. Mitchell testified that he went outside sometime after Garrett because he had heard something. He stated that he saw a “dude” on top of “Plug” and two women fighting on the edge of the street. Mitchell did not know who the “dude” was, but he saw a shiny object in the “the dude’s” hand which he could not identify. Mitchell then testified that he saw the man “slicing” Garrett before getting in the car and driving away.
 

 Garrett testified that, on the night of the altercation, he had been drinking and “hanging out” with Mitchell when he heard some noises outside of his house which he described as “fussing.” Garrett said that, when he went outside, he saw Van Burén and Soles standing behind a car arguing. Garrett asked them to leave, but they did not comply. He then saw a man get out of the car with a shiny knife-like object in his hand, though he could not identify the man because the street was very dark.
 

 Garrett testified that he told the man, “Look, I ain’t got nothing to do with you. I’m just trying to get y’all to move this noise from the front of my house.” Garrett stated that “[the defendant] gave me a look like he was going to do something with the object so I went back in the house and got like a shower rod and came back out.” Garrett stated that Defendant gave him a threatening look and braced himself so Garrett told them “if they ain’t leave there was going to be some trouble or whatever.” Garrett said Defendant then came across the street as if he was going to attack him, so | ¿Garrett struck at him with the shower rod. The rod then broke in half, so Garrett dropped it.
 

 At that point, Garrett testified that he began to run, but Defendant chased after him. Defendant caught Garrett and cut him on the back of his arm which caused him to turn around and fall to the ground. Defendant then got on top of Garrett and began to cut him on his chest, stomach and throat. According to Garrett, Defendant then “bolted.” Garrett said that when he stood up, his neck opened and blood started coming out, so he held his neck and attempted to walk a few paces before he stopped and asked Mitchell to call an ambulance. Garrett testified that he recalled someone bringing him a towel, but he lost consciousness shortly thereafter.
 

 Once at the hospital, Garrett underwent surgery. He was in the hospital for four days and was given medicine for pain and infection. Garrett remained on medication for about two weeks, during which time he could not work. Garrett now has permanent scarring on his neck.
 

 Defendant admitted at trial that he was convicted of aggravated battery approximately ten years ago because he cut someone with a box cutter.
 
 [1]
 
 Defendant then testified that, on the night of the instant altercation, he, Van Burén and a girl named “Sookie” went to pick up Soles at her house. The four drove to West Monroe, dropped off Sookie and then returned to Monroe where they made a few more stops. Defendant stated that Van Burén told him that they wanted to go to Camp Street. Defendant testified that, when they arrived at Camp Street, there was no discussion |Babout money; however, Soles
 
 *533
 
 had originally told him when he first picked her up that she would give him $20 to take her to Wal-Mart and Camp Street.
 

 Defendant testified that, on arriving at Camp Street, Van Burén and Soles got out of the ear and one of them went across the street and knocked on the door of Garrett’s house. Defendant stated that a man (Garrett) came outside and started talking to Van Burén and Soles, but it looked like they were arguing, so Defendant leaned out of the driver’s side window of his car and said, “y’all could just pay me and I can go ahead and leave.” Defendant then testified:
 

 A couple of moments after that, a man— that man that came outside approached my vehicle with a yellow-like rod or something in his hand and started striking. He was saying something as he approached, but I wasn’t listening because he wasn’t talking to me at first. They was having a verbal conversation behind the vehicle. So I didn’t know if he was actually talking to me or not, but as he approached the vehicle he was saying something and he started hitting the window.
 

 Defendant claims that he ducked back and did not respond, but that Garrett likely hit him twice, mostly striking the vehicle. According to Defendant, Garrett then started to open the driver’s door, at which time Defendant got out of the car and grabbed the metal rod in Garrett’s hand. Defendant stated that, when he grabbed the rod, it came apart so he picked up a piece of the rod and began hitting Garrett with it. Defendant testified that he believed his life was in danger because the man was still striking him, even though the man was backing up at the time. Defendant stated that he struck Garrett in the body area until he fell to the ground. Defendant admitted that, once Garrett fell, he hit him two or three more times.
 

 | ^Defendant also testified that he told the detective that he was standing up during the whole fight and was never on top of Garrett. Defendant stated, “And I made that clear that I was not on the ground on top of him. I was still standing. And it was like a real fast moment. I was striking; he was striking at me. He fell and I hit him a couple of times probably a little couple of seconds. It wasn’t no period time he was on the ground.” Defendant claimed that he stopped striking Garrett at about the third strike, when he realized blood was squirting out of his own hand.
 

 Defendant stated that there was no need to strike Garrett anymore because he was on the ground. Defendant said that he then drove away, throwing the object he had used to strike Garrett into the ditch. He testified that Garrett was standing when he left and that he drove in the direction opposite of Garrett because he was worried that Garrett would throw something at the vehicle. During cross-examination, the State asked Defendant, “Were you so angry you just couldn’t control yourself?” Defendant responded, “I wouldn’t think so.”
 

 Detective Quentin Holmes testified that he took Defendant’s recorded statement after his release from the hospital; but, once the recorder was turned off, Defendant started asking questions about what constituted self-defense. Detective Holmes testified that he charged Defendant with second degree murder because the hospital medical staff informed him that Garrett was essentially dead when he arrived at the hospital, he was given six units of blood and he had to be revived. The doctors told Detective |7Holmes that Garrett only had a 50% chance of survival when he went into surgery.
 

 Defendant filed a
 
 pro se
 
 motion for speedy trial, which was granted
 
 ex parte
 
 
 *534
 
 on April 4, 2008, and then vacated and recalled for failure to meet the requirements set forth in La. C. Cr. P. art. 701D(1). Defendant then filed a
 
 pro se
 
 motion to quash the bill of information on October 3, 2008, and a hearing was set for February 29, 2009, on the condition that the motion was adopted by defense counsel. There is no evidence in the record that a hearing was held.
 

 As previously stated, trial was held on April 15, 2009, and Defendant was found guilty as charged on April 17, 2009. The State filed a habitual offender bill of information charging Defendant as a second-felony habitual offender. Defendant was adjudicated as such and sentenced to 60 years at hard labor to be served without the benefit of parole, probation, suspension of sentence or diminution of sentence for good behavior. Defendant now appeals.
 

 DISCUSSION
 

 Assignment of Error Number One (verbatim):
 
 The offense in this case was committed in sudden passion and heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection, and as such, the verdict of attempted second degree murder cannot stand, and the lesser offense of attempted manslaughter should be substituted.
 

 Defendant argues that the evidence does not support a finding of attempted second degree murder and, instead, supports a finding of attempted manslaughter because Garrett, who was the initial aggressor, struck Defendant without any provocation other than a threatening look; | ¡¡and, thus, Defendant reasonably believed his life was in- danger. Defendant further asserts that, even considering the testimony that Garrett was retreating when Defendant attacked him, the distance covered was so short that there was no time for Defendant to cool down. According to Defendant, therefore, the provocation of being “brutally attacked by Plug was sufficient to deprive an average person of self-control and cool reflection.” Defendant concludes that a preponderance of the evidence establishes that he acted in “sudden passion or heat of blood” and, therefore, a rational trier of fact would have found him guilty of attempted manslaughter rather than attempted second degree murder.
 

 The State contends that there is no evidence supporting a conviction for attempted manslaughter. In support of this contention, the State points to Soles’ testimony wherein she stated that she never saw a weapon in Garrett’s hand, other than a shower curtain rod that broke, after which time he ran backward in an attempt to escape Defendant. The State also offers Garrett’s testimony describing Defendant as being on top of him while attacking him. Finally, the State cites Defendant’s own admission that he was not so angry he could not control himself.
 

 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 01-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Carter,
 
 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181,
 
 writ denied,
 
 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 05-0477 (La.2/22/06), 922 So.2d
 
 *535
 
 517;
 
 State v. Robertson,
 
 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Hill,
 
 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 07-1209 (La.12/14/07), 970 So.2d 529.
 

 La. R.S. 14:27 states in pertinent part:
 

 A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
 

 La. R.S. 14:30.1(A) defines second degree murder as “the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm.” In order to convict a defendant of attempted second degree murder, the state must prove beyond a reasonable doubt that the defendant had the specific intent to kill.
 
 State v. Bishop,
 
 01-2548 (La.1/14/03), 835 So.2d 434,
 
 citing State v. Huizar,
 
 414 So.2d 741 (La.1982). Proof of specific intent to inflict great bodily harm is insufficient.
 
 State v. Martin,
 
 92-811 (La.App. 5th Cir.5/31/94), 638 So.2d 411.
 

 Specific intent is the state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1);
 
 State v. Lindsey,
 
 543 So.2d 886 (La.1989),
 
 cert. denied,
 
 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990);
 
 State v. Davies,
 
 35,783 (La.App.2d. Cir.4/5/02), 813 So.2d 1262,
 
 writ denied,
 
 02-1564 (La.5/9/03), 843 So.2d 389,
 
 citing
 
 La. R.S. 14:10(1);
 
 State v. Ellis,
 
 28,282 (La.App.2d Cir.6/26/96), 677 So.2d 617,
 
 writ denied,
 
 96-1991 (La.2/21/97), 688 So.2d 521. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1);
 
 State v. Bishop, supra, citing State v. Butler,
 
 322 So.2d 189 (La.1975);
 
 State v. Martin, supra.
 

 Manslaughter is defined as a “homicide which would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.” La. R.S. 14:31(A)(1);
 
 State v. Quiambao,
 
 36,587 (La.App.2d Cir.12/11/02), 833 So.2d 1103,
 
 writ denied,
 
 03-0477 (La.5/16/03), 843 So.2d 1130. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed. La. R.S. 14:31(A)(1). A defendant is required to prove by a preponderance of Lithe evidence that he acted in “sudden passion” or “heat of blood” for a verdict of manslaughter to be appropriate.
 
 State v. Robinson,
 
 32,794 (La.App.2d Cir.3/1/00), 754 So.2d 311,
 
 writ denied,
 
 00-0989 (La.3/23/01), 787 So.2d 1008.
 

 “Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them.
 
 State v. Lombard,
 
 486 So.2d 106 (La.1986). In reviewing a defendant’s claim that he met this burden, the appellate court must determine whether a rational trier of fact, upon reviewing the
 
 *536
 
 evidence in the light most favorable to the prosecution, could have found that these mitigating factors had not been established by a preponderance of the evidence.
 
 State v. Robinson, supra; State v. Lewis,
 
 28,973 (La.App.2d Cir.12/11/96), 685 So.2d 1130,
 
 writ denied,
 
 97-0122 (La.5/16/97), 693 So.2d 797. The law is clear that, although specific intent to kill is not necessary for a conviction of manslaughter, a specific intent to kill is required for a conviction of attempted manslaughter.
 
 State v. Hutcherson,
 
 34,540 (La.App.2d Cir.4/4/01), 785 So.2d 140;
 
 State v. Jones,
 
 43,963 (La.App.2d Cir.2/25/09), 4 So.3d 950,
 
 writ denied,
 
 09-0839 (La.1/8/10), 24 So.3d 857.
 

 In the case
 
 sub judice,
 
 we find that the evidence was sufficient for a reasonable trier of fact to find Defendant guilty of attempted second degree murder. Testimony presented at trial consistently portrayed Defendant as the aggressor, attacking Garrett by cutting his body and slicing his throat hgwhile he was lying on the ground. One can reasonably infer from the severity of the injuries alone that Defendant had the specific intent to kill Garrett, as he was nearly dead when he arrived at the hospital, required six units of blood and had to be revived by hospital staff.
 

 The question now before this court is whether Garrett’s provocation of Defendant was sufficient to deprive an average person of self-control and cool reflection thereby causing Defendant to act in sudden passion or heat of blood, which would reduce the charge to the lesser responsive charge of attempted manslaughter. The record indicates that Garrett was the initial aggressor who admitted that he armed himself with a metal rod, threatened Defendant and struck first after being given a “threatening look.” Garrett’s role as the aggressor, however, quickly reversed when the shower rod came apart and he began to retreat. Defendant testified that, when the rod came apart, he began hitting Garrett until he backed up and fell, at which point Defendant continued to hit him at least three more times.
 

 A trier of fact could reasonably conclude that an average person would not be so angered by this quick, ineffective attack that he would lose all self-control and cool reflection and start slashing another man’s throat. Further, Defendant admitted in his testimony that he was not so angry that he could not control himself. We are also not persuaded by Defendant’s argument that he did not have enough time to calm down during the short chase before the attack; an average person would not have reacted in such a violent manner.
 

 Accordingly, we find the evidence in this case sufficient to support | ^Defendant’s conviction of attempted second degree murder and, further, that Defendant failed to carry his burden necessary to reduce the conviction to attempted manslaughter. This assignment is without merit.
 

 Assignment of Error Number Two (verbatim):
 
 Artis D. Logan was denied due process of law, the right to bail and the right to a speedy trial in the trial court. The trial court further erred in denying the motion to quash the bill of information.
 

 A.
 
 Denial of Due Process
 

 Defendant asserts that he was denied due process of law when: (1) The trial judge vacated the order granting him a speedy trial without notice or a hearing as required by La. C. Cr. P. art. 701; (2) His trial was continued three times in his absence; and (3) The trial judge required defense counsel to adopt Defendant’s
 
 pro se
 
 motion to quash before a hearing would be held on the matter. In support of his contention that he was denied due process, Defendant cites the Louisiana Supreme Court’s opinion in
 
 State v. Melon,
 
 95-2209
 
 *537
 
 (La.9/22/95), 660 So.2d 466, which states that courts are required to accept and consider post-verdict
 
 pro se
 
 filings from represented defendants. The
 
 Melon
 
 court also found that courts must accept filings in the pre-verdict context from represented defendants when doing so “will not lead to confusion at trial.”
 
 Id.
 

 Citing
 
 State v. Outley,
 
 25,429 (La.App.2d Cir.12/3/93), 629 So.2d 1243,
 
 writ denied,
 
 94-0410 (La.5/20/94), 637 So.2d 476, the State counters that Defendant was not denied due process when the trial judge vacated the order granting a speedy trial without notice or hearing because the trial judge is not required to entertain a
 
 pro se
 
 motion when Defendant is represented by counsel and doing so would lead to confusion at trial. The 114State further asserts that Defendant does not have the right to be both represented and representative; and, in addition, Defendant’s attorney was not aware the motion had been filed.
 
 State v. Holmes,
 
 06-2988 (La.12/2/08), 5 So.3d 42, cert.
 
 denied,
 
 — U.S. -, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009).
 

 Motions pending at the commencement of trial are waived once the defendant proceeds to trial without raising the objection that court has failed to rule on the outstanding motions.
 
 Holmes, supra.
 
 All claims made by Defendant pursuant to La. C. Cr. P. art. 701 are now moot because Defendant has been convicted and sentenced.
 
 State v. Mack,
 
 37,174 (La.App.2d Cir.6/27/03), 850 So.2d 1035,
 
 writ denied,
 
 03-2122 (La.1/16/04), 864 So.2d 628;
 
 State v. Hebert,
 
 29,062 (La.App.2d Cir.1/22/97), 688 So.2d 612. In addition, Defendant’s argument pertaining to the continuances of his trial made in his absence is without merit because he was represented by counsel during each motion.
 

 With regard to Defendant’s
 
 pro se
 
 motion to quash, the trial judge considered the motion and a contradictory hearing was granted, contingent upon defense counsel’s adoption of the motion. There is no evidence in the record that the hearing was ever held or that Defendant objected to the judge’s failure to hold a hearing. The trial judge was within his discretion to make the hearing on the motion contingent on adoption by defense counsel if he found that considering the
 
 pro se
 
 motion without defense counsel would lead to confusion at trial. Since Defendant never objected to | isthe trial judge’s failure to hold a hearing, however, the issue is not reviewable by this court.
 

 B.
 
 Denial of Right to Bail
 

 Defendant also asserts that he was denied his constitutional right to bail contrary to La. Const, art. I, § 18, and La. C. Cr. P. art. 330, because his bail was revoked without a contradictory hearing and a finding that he posed a substantial flight risk or imminent danger to any person or the community. The State argues that Defendant’s claim that he was erroneously denied bail is moot because it was not raised by supervisory review at the time of the bail ruling. We agree.
 

 The appropriate remedy to contest a bail ruling lies in an application for supervisory review at the time of the ruling.
 
 State v. McCloud,
 
 357 So.2d 1132 (La.1978);
 
 State v. Grillette,
 
 588 So.2d 1338 (La.App. 2d Cir.1991). Pretrial bail issues become moot after conviction and sentence.
 
 Grillette, supra.
 
 There is no evidence that Defendant sought supervisory review at the time he was denied bail. Furthermore, because Defendant has been convicted and sentenced, the issue is moot.
 

 C.
 
 Constitutional Right to a Speedy Trial
 

 Citing
 
 Barker v. Wingo,
 
 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972),
 
 *538
 
 Defendant claims that he was denied his constitutional right to a speedy trial. Defendant further asserts that, under
 
 State v. Harris,
 
 03-0524 (La.App. 4th Cir.9/10/03), 857 So.2d 16, he suffered from “palpable abuse” when his motion to quash was not considered, his trial was continued several times and his motion for speedy trial was vacated. | ^Defendant concludes that he was prejudiced by the delay of his trial because he was held without bond and Van Burén was not there to testify once the trial was held.
 

 The State contends that Defendant’s claim that he was denied his constitutional right to a speedy trial is also moot because the claim was not raised prior to Defendant’s conviction and sentencing.
 
 State v. Mack, supra; State v. Yates,
 
 44,391 (La.App.2d Cir.7/1/09), 15 So.3d 1260.
 

 It is well settled that there are two separate and distinct grounds for a defendant’s right to a speedy trial: the statutory right set forth in La. C. Cr. P. art. 701 and the constitutional right embodied in the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution of 1974; the two are not equivalent.
 
 State v. Leonard,
 
 499 So.2d 585 (La.App. 2d Cir.1986);
 
 State v. Price,
 
 96-680 (La.App. 5th Cir.2/25/97), 690 So.2d 191. La. C. Cr. P. art. 701 provides that the sole remedy for failure to commence trial within the mandated time period is pretrial release without bail. Once a defendant has been tried and convicted, his claims under Article 701 become moot.
 
 State v. Mack, supra; State v. Hebert, supra; State v. Outley, supra.
 

 The constitutional right to speedy trial is fundamental and guaranteed to the accused. La. Const, art. I, § 16; U.S. Const. Amends. 6 & 14;
 
 Barker v. Wingo, supra.
 
 The right attaches when an individual becomes an accused, either by formal indictment or bill of information or by arrest and actual restraint.
 
 State v. Bodley,
 
 394 So.2d 584 (La.1981). Louisiana has adopted the balancing test set forth in
 
 Barker v. Wingo, supra,
 
 in which the conduct of both the prosecution and the defendant are weighed. The four factors to be considered under the test are: 1) the length of delay; 2) the reason for the delay; 3) the defendant’s assertion of his right; and 4) prejudice to the defendant, such as the possible impairment of the presentation of the accused’s defense.
 
 Barker v. Wingo, supra; State v. James,
 
 394 So.2d 1197 (La.1981).
 

 A motion to quash is the proper procedural vehicle for challenging an untimely commencement of trial. La. C. Cr. P. art. 532(7); La. C. Cr. P. art. 581;
 
 State v. Morris,
 
 99-3235 (La.2/18/00), 755 So.2d 205. For noncapital felony cases, the State must commence trial within two years from the date of the institution of prosecution. La. C. Cr. P. art. 578(2);
 
 State v. McDonald,
 
 30,854 (La.App.2d Cir.8/19/98), 718 So.2d 542;
 
 State v. Harris,
 
 29,574 (La.App.2d Cir.5/7/97), 694 So.2d 626.
 

 In the case
 
 sub judice,
 
 Defendant’s trial commenced well within the two-year statutory limit. Defendant was arrested on September 24, 2007, and trial commenced in the matter on April 15, 2009. Additionally, Defendant has made no showing that he was prejudiced by the delay. Defendant’s constitutional right to a speedy trial was, therefore, not violated.
 

 This assignment of error is without merit.
 

 Assignment of Error Number Three (verbatim):
 
 The sentence imposed is excessive.
 

 Defendant argues that his sentence is excessive because Garrett was the
 
 *539
 
 initial aggressor and Defendant believed he was defending himself. | ^Defendant also asserts that the prior offense used to adjudicate him as a habitual offender was a conviction for which he had received probation. Defendant further points out that, in the instant case, the State originally offered him a 10-year sentence in exchange for a plea to aggravated battery. Finally, Defendant complains that a 60-year sentence amounts to a life sentence since he is 39 years old; and, thus, the sentence is grossly out of proportion to the seriousness of the offense and is nothing more than a purposeless and needless infliction of pain and suffering.
 

 The State argues that the sentence is supported by the record and is not excessive considering Defendant’s status as a second-felony offender with a prior conviction for a crime of violence.
 

 The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating factor so long as the record reflects that he adequately considered the guidelines of the article.
 
 State v. Smith,
 
 433 So.2d 688 (La.1983);
 
 State v. Lathan,
 
 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890,
 
 writ denied,
 
 07-0805 (La.3/28/08), 978 So.2d 297.
 

 The goal of La. C. Cr. P. art. 894.1 is the articulation of the factual basis for a sentence, not the rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1.
 
 State v. Lanclos,
 
 419 So.2d 475 (La.1982);
 
 State v. Swayzer,
 
 43,350 (La.App.2d Cir.8/13/08), 989 So.2d 267,
 
 writ denied,
 
 08-2697 (La.9/18/09), 17 So.3d 388. The important elements which should be considered are the defendant’s prior criminal record, the seriousness of the offense, the likelihood of rehabilitation and his personal history, including his age, family ties, marital status, health and employment record.
 
 State v. Jones,
 
 398 So.2d 1049 (La.1981);
 
 State v. Ates,
 
 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259,
 
 writ denied,
 
 08-2341 (La.5/15/09), 8 So.3d 581. There is no requirement that specific matters be given any particular weight at sentencing.
 
 State v. Shumaker,
 
 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277,
 
 writ denied,
 
 07-0144 (La.9/28/07), 964 So.2d 351.
 

 Second, a sentence violates La. Const. Art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering.
 
 State v. Smith,
 
 01-2574 (La.1/14/03), 839 So.2d 1;
 
 State v. Dorthey,
 
 623 So.2d 1276 (La.1993);
 
 State v. Bonanno,
 
 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice.
 
 State v. Weaver,
 
 01-0467 (La.1/15/02), 805 So.2d 166;
 
 State v. Lobato,
 
 603 So.2d 739 (La.1992);
 
 State v. Robinson,
 
 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379;
 
 State v. Bradford,
 
 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864.
 

 A trial court has broad discretion to sentence within the statutory limits.
 
 State v. Black,
 
 28,100 (La.App.2d Cir.2/28/96), 669 So.2d 667, writ
 
 denied,
 
 96-0836 (La.9/20/96), 679 So.2d 430. Absent a showing of manifest abuse of that discretion, a sentence will not be set aside as excessive.
 
 State v. June,
 
 38,440 (La.App.2d Cir.5/12/04), 873 So.2d 939;
 
 State v. Lingefelt,
 
 38,038 (La.App.2d Cir.1/28/04), 865 So.2d 280,
 
 writ denied,
 
 04-0597 (La.9/24/04), 882 So.2d 1165;
 
 State v. Guz
 
 
 *540
 

 man,
 
 99-1528, 99-1753 (La.5/16/00), 769 So.2d 1158. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion.
 
 State v. Cook,
 
 95-2784 (La.5/31/96), 674 So.2d 957,
 
 cert. denied,
 
 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
 

 La. R.S. 14:27(D) provides in pertinent part:
 

 Whoever attempts to commit any crime shall be punished as follows:
 

 (l)(a) If the offense so attempted is punishable by death or life imprisonment, he shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence.
 

 15:529.1 reads in pertinent part:
 

 (a) If the second felony is such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then the sentence to imprisonment shall be for a determinate term not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction.
 

 The trial judge stated that he considered many factors prior to sentencing Defendant, including the facts and circumstances of the case, the applicable law and Defendant’s educational background, social history, age and health. The trial judge also considered the impact of Defendant’s crime on his victim and society, a presen-tence investigation report, the sentencing 121factors in La. C. Cr. P. art. 894.1 and the deterrent effect that the sentence will have on Defendant and others in the community-
 

 The trial judge noted that, although Defendant does not have an extensive criminal background, he has shown a propensity for extreme violence. The judge noted that Defendant’s crime “would have been murder but for the immediate response of paramedics, close proximity of the crime scene to LSU Medical Center and well trained competent emergency medical personnel.” The trial judge reasoned that Defendant’s conduct manifested deliberate cruelty toward Garrett because he was trying to flee when Defendant overpowered and attacked him with a dangerous weapon, forcing him to sustain significant permanent injuries. Further, the trial judge pointed out Defendant expressed no remorse for the attack and still maintains that he acted in self-defense.
 

 In mitigation, the trial judge considered that Defendant acted under provocation; however, he concluded that Defendant’s response was disproportionate to Garrett’s initial acts of aggression. He further noted that, once Garrett began to flee, Defendant became the aggressor and his viciousness could not be excused or justified.
 

 The trial judge then sentenced Defendant to 60 years at hard labor to be served without the benefit of probation, parole or suspension of sentence or diminution of sentence for good behavior. The record shows that the trial judge considered the factors set forth in La. C. Cr. P. art. 894.1 and thoroughly articulated a factual basis for the sentence he imposed. Additionally, considering the extremely violent nature of Defendant’s 122crime, the sentence does not shock the sense of justice. Accordingly, we find that the trial judge did not abuse his discretion in sentencing Defendant. This assignment of error is without merit.
 

 CONCLUSION
 

 For the foregoing reasons, the conviction and sentence of Defendant, Artis D. Logan, are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Defendant accepted a plea bargain for the charge and conviction.