CARAWAY, J.
|T Jonterrance Winzer was charged by grand jury indictment and convicted as charged by a jury with the crimes of second degree murder and armed robbery. *138 Winzer received concurrent sentences of life imprisonment for the murder conviction and 99 years for the armed robbery. He appeals his convictions and sentences. We affirm.

Facts

On the afternoon of April 26, 2011, police were dispatched to the home of Johnny Ray Simmons in the Sensley’s Townhouses in Farmerville, Louisiana. Upon their entrance into Apartment 26, police discovered the body of Romon Johnson, who had been shot multiple times. Police investigation revealed the Johnson had been shot as he sold one-half pound of marijuana to Simmons and Nicholas Higgins. It was also learned that 24-year-old Jonterrance Winzer, his 16-year-old brother, Lonnele Shelton, and Meagan Ward had spent the previous night at Simmons’ apartment and were present during, but not privy to, the sale. Simmons’ girlfriend, Ladrina Gray, her niece, Gerreal Gray, and Simmons’ nine-month old daughter were also in the apartment at the time of the shooting.
Police ascertained that Winzer and Simmons were childhood friends. On April 25, after a chance meeting with Simmons, Winzer came by his friend’s apartment with his girlfriend and little brother and played dominoes late into the evening. The three ultimately spent the night at Simmons’ home.
| ¡.Police questioned all individuals present in the apartment at the time of the shooting. Those interviews resulted in Winzer and his brother being implicated as the shooters. Arrest warrants were issued for the two brothers who were ultimately apprehended and arrested in Oklahoma City, Oklahoma.
On May 23, 2011, the Union Parish Grand Jury returned an indictment, charging Winzer with the second degree murder and armed robbery of Johnson. The matter proceeded to trial, and on July 25, 2013, a 12-person jury found Winzer guilty as charged on both counts. Winzer was sentenced to concurrent sentences of life imprisonment for second degree murder and 99 years for armed robbery, without benefit of probation, parole, or suspension of sentence. Winzer did not file a motion to reconsider sentence, but lodged a timely appeal. His appellate counsel raises one assignment of error and in a pro se and supplemental brief, Winzer makes seven additional assignments or error.

Discussion

Sufficiency of the Evidence

In two pro se assignments of error[1] and in Winzer’s assignment of error by counsel, the sufficiency of the evidence is challenged. Winzer argues that none of the eyewitnesses could positively testify that Winzer |sshot or robbed Johnson. Winzer points to inconsistencies in the witnesses’ statements and argues that Simmons’ and Warden’s testimonies were made with expectations of leniency in their own prosecutions. He contends that the witnesses’ testimonies which were fraught with internal contradictions and irreconcilable con *139 flict with physical evidence were not sufficient to support his convictions.
At trial, the state presented the testimony of eleven witnesses, including the Coroner, Dr. Frank Peretti, an expert in forensic pathology. Dr. Peretti testified that Johnson suffered from three gunshot wounds: one to his right eyelid, one in the back of his neck, and one to his right cheek. In Dr. Peretti’s opinion, the right eyelid wound was the fatal shot. He recovered a “small-caliber, non-jacketed bullets, .22’s.”
Both Simmons and Higgins testified. Simmons testified that he and Winzer grew up together. The two had seen each other the day before the incident and Win-zer, Ward and Shelton spent the night at his apartment. On the morning of the incident, Higgins called Simmons to set up a purchase of marijuana with an individual named Johnson, whom Simmons did not know. Simmons recalled that in the late morning, Gerreal Gray arrived at the apartment after getting out of school. She was the niece of Simmons’ girlfriend, La-drina Gray, who also lived in the apartment with the couple’s nine-month old baby. Higgins also arrived.
Near lunchtime, Simmons, Winzer, Shelton and Higgins left the residence to obtain food for everyone. Upon their return, Simmons testified that he and Higgins discussed the marijuana purchase and pooled $310. |4Simmons stated that although the two were originally going to Johnson’s residence, ultimately Johnson came to Simmons’ home. After entering the apartment, Johnson went to the kitchen to join Simmons and Higgins. According to Simmons, it was Higgins who gave Johnson the money for the one-half pound of marijuana contained in a plastic bag. As Johnson counted the money, Simmons smelled the “weed” to “see what grade I got.” Simmons claimed that immediately after the sale, he went to the bathroom and closed the door. As he came out of the bathroom, Simmons saw Shelton standing in front of the dishwasher in the kitchen. Simmons observed “[Shelton’s] hand up and I saw him with the pistol and he shot. That’s when he shot [Johnson].”
Simmons stated that Shelton shot Johnson from behind. He saw the victim fall to the ground. Simmons testified that he went back into the bathroom “soon as he shot [Johnson].” Simmons testified that after he went back into the bathroom, he heard “scuffling and stuff going on.” He peeked out of the door and saw “Winzer, Shelton and Higgins by the front door.” Simmons testified that he guessed “they were jumping on him at the time.” He heard another shot and then everything “calmed down.” Simmons testified that he “looked back out” and saw Shelton and Higgins “moving toward the table part.” As Simmons left the bathroom and ran upstairs, he saw Winzer “picking up the money.” Although he only “caught a glimpse” of Winzer, he was “arm distance” from him and “went right by him” as he ran up the stairs. Simmons recalled that he heard what sounded “like two more gun shots” while upstairs. Simmons also recalled hearing a knock at 15the front door and “running up my steps.” He feared for the safety of his girlfriend and daughter and came out of the bedroom. He saw Higgins, Shelton and Winzer “running out the door at the time.” Simmons stated that he then came downstairs and opened the screen door for police. He saw Johnson “laying down there,” and the bag of money and marijuana were gone.
On cross-examination, Simmons admitted that he pled guilty to accessory after the fact to second degree murder and armed robbery. He also acknowledged that he initially told the police he was upstairs the entire time and did not see *140 who shot Johnson but later gave a second statement in which he admitted being downstairs. He also stated that Winzer and Shelton had no part of the marijuana sale.
Higgins testified that after he got out of classes about 11:15 a.m. on April -26, 2011, he walked to Simmons’ apartment. When he got there, he and Simmons “started negotiating about some marijuana” they were going to buy from Higgins’ friend Johnson. Higgins corroborated that he, Simmons, Winzer and Shelton got food for everyone in the apartment. They traveled in Winzer’s black truck. He testified that he had never seen Winzer or Shelton before that day. He also stated that as they ate lunch, he and Simmons discussed the drug deal in the kitchen. As they did so, Johnson called Higgins and told him he was on his way to Simmons’ apartment. When Johnson knocked on the door, Higgins let him in and the two walked into the kitchen area. According to Higgins, Johnson pulled out the seven ounces of marijuana packaged in a plastic bag. Johnson placed the |fimarijuana on the counter and Higgins gave him the money. Higgins testified that as Johnson counted the money, Shelton came behind him and shot him once. Johnson fell down and Higgins “went up to Lonnele Shelton,” and “tried to take the gun from him.”
Higgins testified that as the two were “wrestling over the gun,” he “slipped down” and Winzer “came over there with a mop stick,” and “started beating me with it.” Higgins recalled that the three were in the kitchen entrance during these events. Higgins testified that Winzer pulled him toward the kitchen area and Shelton “came through and hit me with the gun.” Shelton told Higgins to be quiet and not move. Eventually Shelton made him “get up and move” near a table. Higgins testified that Shelton held him at gunpoint. During these events, Higgins heard Winzer state, “he’s still moving.” Higgins stated that he saw Winzer get “the gun from his brother,” and “went and shot [Romon Johnson] two more times.” Shelton remained in Higgins’ “eyesight” and stated he knew Shelton did not shoot Johnson. He did not see where Winzer shot Johnson. Higgins testified that after Winzer shot Johnson, “he gave the gun back to his little brother, Lonnele Shelton.” Shelton held Higgins at gunpoint, “talking about what he going to do with me.” Higgins recalled seeing Shelton picking up the money, but he did not see anyone pick up the marijuana. Higgins remembered that the two brothers discussed what they were going to do with Johnson’s body.
Higgins testified that someone came to the front door and Winzer and Shelton ran upstairs. It was then that Higgins ran outside and informed |vJohnson’s family that he had been shot. He went back to Simmons’ apartment with Johnson’s brother and mother. When he got back to the apartment, Winzer, Shelton and Warden were gone. The money and marijuana were also gone. Higgins suffered a nose injury and swelling from being hit with the gun and broom handle.
On cross-examination, Higgins admitted that he initially told police that after the first shot, he blacked out. He explained that he meant he was “scared a lot,” by seeing “somebody die right in front of your eyes.” He did not believe that those feelings affected what he saw. Higgins admitted that in 2012, he pled guilty to attempted possession of marijuana.
Gearrel Gray testified that she was in the apartment at the time of the incident. She recalled that as she entered the apartment, Winzer, Shelton and Warden were seated at a table. Higgins also arrived at the apartment about five minutes after she *141 got there. Gray testified that she ate her lunch on a small couch. She stated that Higgins was in the kitchen “counting money” and she heard him “call somebody up on the phone telling him how to get to the apartment.” Johnson came to the apartment and went into the kitchen with Higgins. She heard and saw nothing of what transpired between the two men until she heard two gunshots “back towards the kitchen.” She got behind the couch and observed what she saw by looking around the couch. Gray did not see who fired the shots, but turned around to see “the younger one” fighting Higgins. She thought that Higgins was “trying to fight the gun out his hand while he’s beating him up.” Gray testified that she heard Shelton tell Higgins that he talked too much. IsHiggins was “hollering and kicking both of them.” After that she heard two or three more gunshots and Shelton instruct Winzer to “get the money.” Gray also heard Shelton and Winzer discuss where they were going to take the body. Gray testified that she never saw a gun. She stated that when somebody knocked on the door, Shelton and Winzer ran upstairs and Higgins ran out of the house. Thereafter, Gray stated that Shelton and Winzer also ran out of the house with Warden.[2]
On cross-examination, Gray confirmed that she did not see who fired the two gunshots and did not see any marijuana or money.
Warden corroborated the events leading up to the shooting. She witnessed Johnson enter the apartment and go into the kitchen. She saw only Higgins in the kitchen with Johnson and did not hear anything they said. She “knew what they were doing” but did not see marijuana or money. Warden testified that Higgins and Johnson were standing very close to one another. As she sat at the dining room table eating, Warden heard gunshots; she did not see who fired them. According to Warden, at the time of the gunshots, Win-zer and Shelton were standing “around the kitchen door area.” Johnson was “around the counter part.” After she heard the shot, Warden got down on the floor in front of the large couch. She then heard' “tussling, the moving around.” Warden testified that it was “Jonterrance and Lon-nele and Nick” involved in the tussling around the front door area. Warden stated that the three “wound up at the table that I was originally sitting at.” fyHiggins was on one side and Winzer and Shelton were on the other. She heard somebody yelling at Higgins to “shut up and sit down.” Warden recalled Winzer saying that “he’s still moving,” and then she heard more gunshots. She did not see who fired the shots. She saw Shelton holding a very small handgun toward Higgins. She had seen Winzer holding the gun prior to that day. Warden testified that she heard Winzer and Shelton “trying to figure out what to do with the body.” Warden recalled that Winzer and Shelton went “upstairs for a while,” when there was a knock at the door. At that time, Higgins “ran out the door.” Winzer and Shelton then came downstairs and yelled at her to follow them. The three got into the truck and Winzer drove. Warden sat in the passenger seat and Shelton was in the back. The three traveled toward Bernice, Louisiana, and made a detour on *142 a dirt road. Warden heard Shelton and Winzer discuss what happened. Winzer said that Johnson “must’ve had an angel watching over him because it took more than one shot.” Warden saw that Winzer had money “popping out his pocket.” She had given him $20 or $30 the night before; she did not know how much he had left. Winzer and Shelton discussed the fact that Shelton had “missed Nick.” The brothers dropped Warden off at her apartment; this was the last time she saw either of them.
On cross-examination, Warden testified that she did not “really” change her statements to police, although she “added some that I didn’t say the very first time.” She admitted pleading guilty to accessory after the fact to second degree murder, armed robbery and resisting an officer, and was |inawaiting sentencing. Warden admitted that the only person she saw with a gun in his hand was Shelton.
Police testimony showed that the Farm-erville Police Department was dispatched to Simmons’ apartment around 2:00 p.m. The scene was photographed and evidence collected, but no money, handguns or marijuana were found, except a small bag of marijuana recovered from a drawer in the kitchen. The black truck was later found and searched but it did not contain the gun, the marijuana or the money. Police received an anonymous tip that Winzer and Shelton were possibly in Oklahoma City, where they were subsequently arrested and extradited to Louisiana.
Winzer invoked his Fifth Amendment right to not testify. The defense did not present any witnesses.
When issues are raised on appeal, both as to the sufficiency of evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Lewis, 48,373 (La.App.2d Cir.9/25/13), 125 So.3d 482. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/05/03), 852 So.2d 1020.
InEvidence may be direct or circumstantial. Direct evidence provides proof of the existence of a fact, for example, a witness’s testimony that he saw or heard something. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by the evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 09-0372 (La.11/6/09), 21 So.3d 299.
Winzer was charged with second degree murder, which is defined by La. R.S. 14:30.1 (A)(1) as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. He was also charged with armed robbery, defined as the taking of anything of value belonging to another from the person of another or that is in the immedi *143 ate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. .14:64.
Specific intent is the state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act. La. R.S. 14:10(1). Specific intent to kill can be inferred from the intentional use of a deadly I ^weapon such as a knife or a gun. State v. Fields, 42,761 (La.App.2d Cir.1/9/08), 973 So.2d 973, writ denied, 08-0469 (La.9/26/08), 992 So.2d 983.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. It is the function of the trier of fact to assess credibility and resolve conflicting testimony. State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993); State v. Bonnett, 524 So.2d 932 (La.App. 2d Cir.1988), unit denied, 532 So.2d 148 (La.1988). The trier of fact senses first hand the testimony, and unless the fact finder’s assessment of believability is without any rational basis, it should not be disturbed by a reviewing court. State v. Mussall, 523 So.2d 1305 (La.1988); State v. Combs, 600 So.2d 751 (La.App. 2d Cir.1992), writ denied, 604 So.2d 973 (La.1992). A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529. Where there is conflicting testimony about factual matters, the resolution of which depends' upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, units denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
11sWhen a witness is impeached, the jury, as the trier of fact, is presented with evidence it may consider and weigh in determining the credibility, or believability of the witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury is prohibited from believing anything said by the witness. The inconsistencies in the witness’s statements are one of any number of factors the jury weighs in determining whether or not to believe a witness’s trial testimony. State v. Williams, 35,911 (La.App.2d Cir.9/18/02), 828 So.2d 180; State v. Dunn, 30,346 (La.App.2d Cir.2/25/98), 708 So.2d 512.
Moreover, in the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App.2d Cir.5/9/07), 956 So.2d 769; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 06-1083 (La.11/9/06), 941 So.2d 35.
The basis of Winzer’s argument is the reliability of Simmons’, Warden’s and Higgins’ testimony considering the inconsistent statements made by each to police and/or expected leniency in sentencing for their own convictions. Winzer also argues that no eyewitness was able to identify him as Johnson’s shooter or robber. Nevertheless, the record shows that upon defense cross-examination, Simmons, Warden and Higgins admitted making inconsistent statements to police. Addition *144 ally, on cross-examination, both Simmons and Warden admitted pleading guilty to accessory after the fact to second degree murder and armed robbery as well as their impending [ 14sentencing for each offense. Thus, the jury was made aware of these facts and accepted the witnesses’ testimony as credible. Such weight and credibility determinations remain within' the jury’s discretion and will not be disturbed on appeal. Gray, Warden and Hamilton gave independent accounts of the event. Considering that the testimony substantially corroborated the accounts of Higgins and Simmons, any minor differences in each individual witness’s testimony was not so internally contradictory so as to undermine the totality of their testimony. Higgins’ return to the scene after the events further validates his testimony. Nor did the testimony create irreconcilable conflict with physical evidence as it related to the proof of elements of the crime.
If believed, this testimony along with the other evidence establishes that two sets of shots were fired at Johnson. Simmons and Higgins witnessed Shelton inflict the first shot or shots, which caused Johnson to fall to the ground. Corroborating that evidence was Gray’s testimony that she saw Shelton and Higgins tussle for control of the gun. Warden and Higgins also substantiated the circumstances of the fight. During the ensuing scuffle, Warden and Higgins identified Winzer as stating, “he’s still moving.” Thereafter, Higgins saw Winzer grab Shelton’s gun and shoot in the direction of Johnson’s body. It was after this incident that Higgins, Warden and Gray heard Winzer and Shelton discuss what to do with Johnson’s body. Winzer bragged afterwards that it took more than one shot to kill Johnson. Although Higgins recalled that it was Shelton who took the money, Simmons stated that he saw Winzer picking up the money involved |15in the drug transaction and Gray heard Shelton tell Winzer to pick up the money. No drugs or money relating to the sale were found by police in the apartment and Warden witnessed Winzer with money bulging out of his pockets as the three fled the crime scene.
This direct and circumstantial evidence is sufficient to convict Winzer of the charged offenses. From Higgins’ eyewitness account of Winzer grabbing the gun from his brother after commenting that Johnson was still moving, the jury could have reasonably inferred that it was Win-zer who inflicted the fatal shot to Johnson. Likewise, even with the conflicting accounts from the scene of the shooting regarding who took the money from Johnson, the jury reasonably accepted Simmons’ account of Winzer taking the drug money after killing Johnson, considering Warden’s corroborating testimony that Winzer left the scene with money hanging out of his pockets.[3] After viewing this evidence in the light most favorable to the state, any rational trier of fact could have found Winzer guilty of the essential elements of armed robbery beyond a reason *145 able doubt. These assignments of error have no merit.

Motions

In his second and third pro se and supplemental assignments of error, Winzer argues that the trial court erred in failing to rule on or grant a 11ficontradictory hearing on his motion to quash and continuance. Winzer refers only to jurisprudence regarding the motion to quash and does not provide any particularized arguments. The record reflects that a pro se motion to quash was filed on June 6, 2012. In it Winzer made a cursory argument that he had been illegally arrested and that “prejudicial legalism and racism played a large and controlling role in the warrant and arrest”; the majority of the motion questioned the legality of the indictment. The record does not reflect a ruling on the motion to quash and Winzer proceeded to trial without calling attention to the lack of ruling. Nor did he raise any issue relating to the arrest warrant at trial. It is well established that motions pending at the commencement of trial are waived when the defendant proceeds to trial without raising the issue that the motions were not ruled upon. State v. Holmes, 06-2988 (La.12/2/08), 5 So.3d 42, cert. denied, 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009). This includes a motion to quash. State v. Logan, 45,136 (La.App.2d Cir.4/14/10), 34 So.3d 528, writ denied, 10-1099 (La.11/5/10), 50 So.3d 812; State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 08-0499 (La.11/14/08), 996 So.2d 1086.
Moreover, a trial court is not required to entertain motions filed by a defendant who is represented by counsel. While an indigent defendant has a right to counsel as well as the opposite right to represent himself, he has no constitutional right to be both represented and representative. Holmes, supra. For these reasons, these assignments of error have no merit.
|17In his supplemental brief, Win-zer argues that the trial court erred in denying a continuance of the trial. The record shows that on June 25, 2013, the court heard a defense motion for continuance on the grounds that the state had provided “voluminous” discovery responses two weeks prior to the hearing for which the defense needed additional time to review. After reviewing the discovery response, the trial court denied the motion for continuance finding that he information was not “that voluminous” and did not contain “significantly new information.” The court concluded that the filing of the discovery was “actually more than 30 days” prior to trial and that a previous continuance had been granted the defense. Voir dire began on July 23, 2013.
The decision to grant or deny a motion for continuance rests within the sound discretion of the trial court, and a reviewing court will not disturb a trial court’s determination absent a clear abuse of discretion. La.C.Cr.P. art. 712; State v. Harris, 01-2730 (La.1/19/05), 892 So.2d 1238, cert. denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005); State v. Moffett, 47,430 (La.App.2d Cir.9/26/12), 105 So.3d 138, writ denied, 12-2464 (La.4/12/13), 111 So.3d 1017.
Even when an abuse of discretion is shown, a conviction will not be reversed based upon the denial of a continuance absent a showing of specific prejudice. Harris, supra; Maffett, supra; State v. Hill, 46,050 (La.App.2d Cir.4/20/11), 64 So.3d 801, unit denied, 11-1078 (La. 11/14/11), 75 So.3d 940.
|lsWe find no abuse of discretion in the trial court’s denial of Winzer’s request for continuance. The court reviewed the dis *146 covery responses and concluded that they were not so voluminous or substantial that counsel would be unable to adequately prepare for trial. Nor has Winzer alleged specific prejudice to his case by the denial of the motion. For these reasons, this assignment of error has no merit.

Arrest Probable Cause

In his fourth pro se supplemental assignment of error, Winzer raises the issue of sufficient of probable cause relating to his arrest. He argues that the magistrate issued the arrest warrant based upon inconsistent testimony. As noted above, Winzer waived his right to contest the legality of the arrest warrant. Moreover, in his motion to quash, he argued that the arrest was illegal due to racism and prejudice. A new ground for objection cannot be presented for the first time on appeal. La.C.Cr.P. 841; State v. Cressy, 440 So.2d 141 (La.1983); State v. Harris, 414 So.2d 325 (La.1982); State v. Davis, 357 So.2d 1125 (La.1978). In fact, it has been held that a defendant may not raise new grounds for suppressing evidence on appeal that he did not raise at the trial court in a motion to suppress. State v. Barnett, 12-816 (La.App.5th Cir.5/16/13), 118 So.3d 1156; State v. Carter, 10-973 (La.App.5th Cir.8/30/11), 75 So.3d 1. On these grounds, Winzer’s argument is without merit.

Brady Violation

Winzer argues that Higgins’ trial testimony “put the whole case in such a different light as to undermine confL dence in the verdict.” He | ^contends that his testimony which identified Shelton as the first shooter and him as the second shooter “was withheld from defense,” and undermined the outcome of the trial in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d. 215 (1963). When the defendant requests it, the state must produce evidence that is favorable to the accused, if that evidence is material to guilt or innocence. Brady, supra. This rule also applies to evidence which impeaches the testimony of a witness when the credibility of that witness may be determinative of guilt or innocence. State v. Bright, 02-2793 (La.5/25/04), 875 So.2d 37.
We find no merit to Winzer’s Brady claim. Brady addresses issues of pretrial discovery. Moreover, Higgins’ trial testimony did not include exculpatory evidence. Thus, this portion of Winzer’s argument is without merit.

Ineffective Assistance of Counsel

Winzer also specifies three areas in which he believes his trial counsel’s behavior was ineffective. These include a failure to file a motion for acquittal or a motion for post verdict judgment of acquittal; a failure to impeach Higgins for making two conflicting statements that both Shelton and Higgins shot Johnson twice; and a failure to impeach Simmons and Warden for giving conflicting statements.
As a general rule, a claim of ineffective assistance is more properly raised in an application for post conviction relief (“PCR”) in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La.C.Cr.P. art. 930. State v. Cook, 48,355 (La.App.2d20 Cir.11/20/13), 127 So.3d 992, writ denied, 13-3000 (La.5/30/14), 140 So.3d 1174; State v. Ellis, 42,520 (La.App.2d Cir.9/26/07), 966 So.2d 139, writ denied, 07-2190 (La.4/4/08), 978 So.2d 325. However, when the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 (La.1982); Cook, supra. Therefore, in the interest of judicial economy, those portions of Winzer’s claims of ineffective assistance *147 for which the record is sufficient will be addressed on appeal.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. This requires a showing that counsel made errors so serious that he was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The relevant inquiry is whether counsel’s representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal eases. Id. The assessment of an attorney’s performance requires that his conduct be evaluated from counsel’s perspective at the time of the occurrence. A reviewing court must give great deference to the trial court’s judgment, tactical decisions and trial strategy. There is a strong presumption that trial counsel has exercised reasonable professional judgment. Cook, supra; State v. Tilmon, 38,003 (La.App.2d Cir.4/14/04), 870 So.2d 607, writ denied, 04-2011 (La.12/17/04), 888 So.2d 866.
12iOnce the attorney’s performance is found to have been deficient, the defendant must show that counsel’s deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Strickland, supra. The defendant must prove the deficient performance caused him an actual prejudice so severe that, but for his counsel’s deficient performance, there is a reasonable probability that the outcome of the proceedings would have been different. Strickland, supra; Cook, supra.
Ineffective assistance claims must both identify specific acts or omissions by counsel and state how these actions resulted in actual prejudice so severe that the defendant was denied a fair trial; general statements and eonclusory charges will not suffice. Id.
To challenge a conviction based upon a claim of insufficiency of the evidence, a defendant should proceed by way of urging a motion for acquittal or a motion for post verdict judgment of acquittal. La.C.Cr.P. art. 778; La.C.Cr.P. art. 821. Motion for acquittal is not authorized in a jury trial of a criminal matter. La.C.Cr.P. art. 778. The defendant may move for a post verdict judgment of acquittal following the verdict; a motion for a post verdict judgment of acquittal must be made and disposed of before sentence. La.C.Cr.P. art. 821(A).
In this matter, defense counsel was not authorized to file a motion for acquittal because the defendant opted for a jury trial instead of a bench trial. La. C.Cr.P. art. 778. Moreover, although counsel did not file a motion for post verdict judgment of acquittal, we have reviewed the sufficiency of the | 2aevidence in connection with the first assignment of error and have concluded the evidence was sufficient for conviction. When the substantive issue that an attorney has not raised has no merit, then the claim that the attorney was ineffective for failing to raise the issue also has no merit. State v. Francois, 13-616 (La.App. 5th Cir.1/31/14), 134 So.3d 42; State v. Williams, 613 So.2d 252 (La.App. 1st Cir.1992). Accordingly, this portion of Winzer’s argument is without merit.
Winzer also argues that his trial counsel was deficient because he failed to impeach Simmons, Warden and Higgins with prior inconsistent statements allegedly made by them to police. The basis of Winzer’s claims regarding Warden and *148 Simmons is that “both made statements to detectives denying knowing factual elements,” and later made “additional statements.” Cross examination is a strategy decision and this court affords great deference to a trial counsel’s tactical decisions and trial strategy. State v. Moore, 48,769 (La.App.2d Cir.2/26/14), 134 So.3d 1265. Winzer fails to specify the content of Simmons’ and Warden’s statements or how failing to impeach the witnesses based upon these inconsistent statements would have prejudiced his case. Such conclusory allegations are insufficient to establish a claim of ineffective assistance of counsel.
Winzer’s argument that trial counsel’s failure to impeach Higgins with his alleged previous statements that each brother shot Johnson two times “undermined confidence in the outcome of the trial,” is also unsupported by the record. Despite any inconsistencies in the witness’s recollection of how many shots were fired, he consistently identified Winzer |¡¡sas having shot Johnson. Thus, Winzer has demonstrated no prejudice in counsel’s failure to elicit the subject information on cross-examination.
Moreover, because the overwhelming testimony of the eyewitnesses identified Winzer as a knowing and active participant, who aided and abetted in the commission of the crimes, any failure by counsel to cross-examine the eyewitnesses about - specific alleged inconsistencies in their identification of the shooter or description of the number of gunshots involved in the event, fails to raise a reasonable probability sufficient to undermine confidence in the outcome of the trial. Thus, Winzer’s arguments are without merit.
Winzer’s convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.

. In his supplemental assignment of error No. 1, Winzer also argues that his appellate counsel was unable to "sufficiently challenge defendant’s Fourteenth Amendment Due Process violation by State” due to an incomplete transcript and this court's determination that no further extension of the return day would be considered after January 26, 2014. The record shows that Winzer's trial counsel designated "the entire transcript of each hearing herein and all of the pleadings” for inclusion in the appellate record for review. The subject extensions certified that the entirety of this information be contained in the record. Because the record shows that all designated information was filed into the record on February 28, 2014 and Winzer’s counsel filed his brief on May 5, 2014, Winzer’s argument that counsel was without portions of the transcript is without merit.

. JaMarkus Hamilton testified that as he rang Simmons’ doorbell on April 26, 2011, Higgins ran out telling them to go; Higgins’ lip was bloody. Hamilton and another man hid behind the building and saw two males and a female exit the apartment. He was not able to identify Winzer as one of those males. Hamilton further testified that the three individuals got into a black truck and headed west after backing into the building and damaging the bumper.

. Regardless of which brother fired the fatal blow or took the money from Johnson, the evidence presented by the state would also have been sufficient to convict Winzer as a principal to both crimes considering the consistent eyewitness accounts of his active participation in the events leading to Johnson's death and robbery. All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. Those persons who knowingly participate in the planning or execution of a crime are principals. State v. Mason, 47,642 (La.App.2d Cir. 1/16/13), 109 So.3d 429, writs denied, 13-0423 (La.7/31/13), 118 So.3d 1116, 13-0300 (La.9/13/13), 120 So.3d 279.